ACE LOBSTER CO., INC.
and Alan Eagles,

v.

Donald L. EVANS, in his official capacity as Secretary of the U.S. Department of Commerce.

Campanale & Sons, Inc., C.E.H., Inc. and Narragansettt Seahawk, Inc.,

v.

The Honorable Donald L. Evans, in his official capacity as Secretary of Commerce.[1]

Jenny Mae, Inc., Violet Fish & Trap Company, Inc., Red Devil Fish & Lobster Company, Inc., Palombo Fishing Corp., Palombo Fisheries, Ltd., Palombo–Nippert Fishing Corp. and Garry Mataronas,

v.

The Honorable Donald L. Evans, in his official capacity as Secretary of Commerce.

Nos. CIV. A. 00–004L, CIV. A. 00–005L, CIV. A. 00–006L.[2]

United States District Court,
D. Rhode Island.

Sept. 12, 2001.

---

**1.** Donald L. Evans is substituted as the current Secretary of Commerce for William M. Daley. *See* Fed.R.Civ.P. 25(d)(1). The parties assented to this substitution at oral argument on April 11, 2001.

**2.** On January 7, 2000 this case was transferred from Judge Lisi and assigned to Judge Lagueux.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This Court cannot improve on the Report and Recommendation of United States Magistrate Judge Robert W. Lovegreen dated May 4, 2001. Therefore, the Report and Recommendation hereby is adopted and accepted pursuant to 28 U.S.C. § 636(b)(1)(B).

The bottom line in this case is that the overall trap limit imposed by the Secretary on the deep-sea lobstermen is a reasonable interim conservation measure until such time as the Secretary can secure enough information to develop a fair, individualized, historical trap limit for those lobstermen.

Therefore, the Clerk shall enter judgment for the defendant in these three consolidated cases forthwith.

It is so ordered.

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

All plaintiffs are American lobster fishermen and lobster business owners or shareholders, who reside and whose vessels are berthed in Rhode Island. The three complaints (the first two filed on January 4, 2000, and Jenny Mae, Inc.'s filed on January 5, 2000) allege that certain regulations implemented by the Secretary of Commerce regarding lobster fishing violate the Administrative Procedures Act ("APA"), various provisions of the Magnuson–Stevens Act, and the Regulatory Flexibility Act ("RFA"). The parties stipulated to consolidate the three cases, and the court ordered the cases consolidated on March 16, 2000. Defendant filed his answer on April 11, 2000. On June 7, 2000, defendant filed with the court the certified Administrative Record ("Record") relating to the disputed regulations. Plaintiffs then filed their consolidated motion for summary judgment ("Plaintiffs' Motion") on October 20, 2000, and defendant submitted its objection and cross-motion for summary judgment ("Defendant's Motion") on December 1, 2000. Contemporaneously submitted was defendant's statement of undisputed facts ("Defendant's Facts"). Subject matter jurisdiction is alleged pursuant to 5 U.S.C. § 611 (the provisions for judicial review within the RFA), 28 U.S.C. § 201 of the Declaratory Judgment Act, and 5 U.S.C. §§ 701–706 (the provisions for judicial review within the APA).

This matter has been referred to me for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). A hearing was held on April 11, 2001. After examining the memoranda submitted, listening to the arguments of counsel, and researching the issues involved, I recommend that defendant's motion for summary judgment be granted and that plaintiffs' motion for summary judgment be denied.

*Factual Background*

The American lobster, *Homarus americanus*, is a bottom-dwelling, marine crustacean that has a shrimp-like body and ten

legs, two of which are enlarged to serve as crushing and gripping appendages. Record, 5447. The meat of the lobster is so highly prized that it supports one of the most intense and valuable fisheries in North America. *Id.* The lobster fishery is predominantly sustained by landings from lobster traps: from 1964 through 1994, the average percentage of landings from the non-trap sector totaled 5.74%, and from 1984 to 1994 it was 2.33%. *Id.* at 5448.

The lobster trap regulations that have spawned the instant lawsuit are located at 50 C.F.R. §§ 697.19 and 697.4(a)(7)(v), and provide as follows:

§ 697.19 Trap limits and trap tag requirements for vessels fishing with traps.

(a) Trap limits for vessels fishing or authorized to fish in any Nearshore Management Area.

(1) Beginning January 5, 2000, through April 30, 2000, vessels fishing in any EEZ[3] management area except EEZ Offshore Management Area 3, shall not fish with, deploy in, possess in, or haul back from such area more than 1,000 traps.

(2) Beginning May 1, 2000, vessels fishing in or issued a management area designation certificate or valid limited access American lobster permit specifying the EEZ Nearshore Management Area(s) and the Area ⅔ Overlap, or, only the Area ⅔ Overlap, shall not fish with, deploy in, possess in, or haul back from such area more than 800 traps.

(b) Trap limits for vessels fishing or authorized to fish in the EEZ Offshore Management Area.

(1) Beginning January 5, 2000, through April 30, 2000, vessels fishing only EEZ Offshore Management Area 3, or, fishing only EEZ Offshore Management Area 3 and the Area ⅔ Overlap, shall not fish with, deploy in, possess in, or haul back from such area more than 2,000 traps.

(2) Beginning May 1, 2000, vessels fishing only in or issued a management area designation certificate or valid limited access American lobster permit specifying only EEZ Offshore Management Area 3, or, specifying only EEZ Offshore Management Area 3 and the Area ⅔ Overlap, shall not fish with, deploy in, possess in, or haul back from such area more than 1,800 traps.

(c) Trap tag requirements for vessels fishing with traps. Beginning May 1, 2000, any lobster trap fished in Federal waters must have a valid Federal lobster trap tag permanently attached to the trap bridge or central crossmember.

(d) In any fishing year, the maximum number of tags authorized for direct purchase by each permit holder is the applicable trap limit specified in paragraphs (a) and (b) of this section plus an additional 10 percent to cover trap loss.

§ 697.4 Vessel permits and trap tags.

(a) Limited access American lobster permit. Any vessel of the United States that fishes for, possesses, or

---

**3.** "EEZ" stands for the Exclusive Economic Zone, an area from 3 to 200 nautical miles from the shore which is protected by the federal government. These federally protected waters consist of "nearshore" (from 3 to roughly 30 miles) and "offshore" (30 to 200 miles) waters. The waters within 3 nautical miles from the shore are generally protected by the states, and are often referred to as "coastal" or "in-state" waters. *See* 16 U.S.C. §§ 1802(11), 5102(6); Defendant's Motion, P. 4 n. 2; Defendant's Demonstratives, P. 4 (map of lobster fishery delineating management areas), April 11, 2001.

lands American lobster in or harvested from the EEZ must have been issued and carry on board a valid Federal limited access lobster permit. This requirement does not apply to: charter, head, and commercial dive vessels that possess six or fewer American lobsters per person aboard the vessel if such lobsters are not intended for, nor used, in trade, barter or sale; recreational fishing vessels; and vessels that fish exclusively in state waters for American lobster.

.　　.　　.　　.　　.

(7) Management area designations for vessels fishing with traps.

.　　.　　.　　.　　.

(v) A vessel issued a lobster management area designation certificate or limited access American lobster permit specifying more than one EEZ management area must abide by the most restrictive management measures in effect for any one of the specified areas, regardless of the area

being fished, for the entire fishing year.

*Id.*

Plaintiffs object in particular to § 697.19(b)(2), which limits all vessels licensed to fish in the offshore zone of Area 3 to 1800 lobster traps ("uniform trap cap"), and to the requirement in § 697.4(a)(7)(v) that vessels fishing in more than one EEZ management area must abide by the most restrictive management measures in place in any one of the EEZ areas. Plaintiffs' complaint[4] comprises six principal claims: first, that the defendant's decision to adopt the regulations is arbitrary and capricious because it does not contemplate the historic participation of fishing vessels in the lobster fishery. Plaintiffs also argue that a regulation reflecting historic participation would more effectively serve lobster conservation and management goals. Second, plaintiffs assert that defendant did not consult with the appropriate councils before issuing the regulations, and that the regulations are not compatible with "effective implementation of a coastal fishery management plan," in violation of the Atlantic Coast Fisheries Cooperative Management Act ("ACFCMA").[5] Third,

---

**4.** Though plaintiffs have brought three separate actions, subsequently consolidated, their claims are identical.

**5.** *See* 16 U.S.C. §§ 5101–5108 (1993). 16 U.S.C. § 5103(b) provides the following procedure for adopting regulations within the EEZ:

b) Federal regulation in exclusive economic zone
(1) In the absence of an approved and implemented fishery management plan under the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), and after consultation with the appropriate Councils, the Secretary may implement regulations to govern fishing in the exclusive economic zone that are—
(A) compatible with the effective implementation of a coastal fishery management plan; and

(B) consistent with the national standards set forth in section 301 of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1851).
The regulations may include measures recommended by the Commission to the Secretary that are necessary to support the provisions of the coastal fishery management plan. Regulations issued by the Secretary to implement an approved fishery management plan prepared by the appropriate Councils or the Secretary under the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.) shall supersede any conflicting regulations issued by the Secretary under this subsection.
. . . .

.　　.　　.　　.　　.

plaintiffs claim that the regulations violate National Standards 1, 2, 4, 6, and 8 of the Magnuson–Stevens Act, pursuant to 16 U.S.C. § 1851(a) (1994), as incorporated by the ACFCMA. Fourth, plaintiffs claim that the regulations do not comport with the requirements of the Regulatory Flexibility Act, pursuant to 5 U.S.C. §§ 603, 604 (1996). Fifth, plaintiffs claim that defendant did not have authority under the ACFCMA to withdraw the previous lobster management plan and promulgate the new regulations. Finally, plaintiffs state that defendant abused his discretion and violated his statutory authority by promulgating § 697.4(a)(7)(v).

### a. Statutory and Regulatory Background

The procedures for implementing regulations affecting the lobster fishery encompass two federal statutes, the Magnuson–Stevens Act and the ACFCMA, both of which are implicated in this case.

### i. The Magnuson–Stevens Act

Congress enacted the Magnuson Act (later renamed the Magnuson–Stevens Act) in 1976 "intend[ing] to respond to overfishing[6] and inadequate conservation measures which were threatening future commercial and recreational fishing, as well as the very survival of species." Parravano v. Babbitt, 837 F.Supp. 1034, 1040 (N.D.Cal.1993), aff'd, 70 F.3d 539 (9th Cir. 1995), cert. denied, 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996) (citing 16 U.S.C. § 1801(a)); Lovgren v. Byrne, 787 F.2d 857, 861 (3d Cir.1986) (Magnuson–Stevens Act "was enacted at a time when overfishing of coastal waters was commonplace, threatening the existence of a number of species of fish."). In order to render more efficient the management process provided for in the Magnuson–Stevens Act, Congress also "created eight regional fishery management councils composed of state fishery managers, the regional NMFS [National Marine Fisheries Service] fisheries administrator, and qualified fishing industry, academic, and environmental representatives." A.M.L. International, Inc. v. Daley, 107 F.Supp.2d 90, 93 (D.Mass.2000) (citing 16 U.S.C. § 1852(a)(1)). Each council controls the fisheries seaward of the states comprising it, and the primary responsibility of the councils is the development of fishery management plans that establish the rules for each fishery and meet national conservation and management standards established in the Magnuson–Stevens Act. Id. (citing 16 U.S.C. § 1852(h)).

The rationale for the changes to the Magnuson–Stevens Act that occurred in 1996 are best summarized by the following language from the A.M.L. case:

> In 1996, Congress ushered in a new era in fisheries management by making significant revision to the Magnuson–Stevens Act through the Sustainable Fisheries Act. See Pub.L. No. 104–297, 110 Stat. 3559 (1996). The Magnuson–Stevens Act was revised because, "it was very clear that major changes were needed. Despite numerous efforts to improve the law over the past two decades, the sad reality [was] that the act did not prevent the current crisis in ... groundfish stocks, a crisis for the conservation of both fish stocks and fishing

6. "The terms 'overfishing' and 'overfished,' under the Magnuson–Stevens Act, mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29). Maximum Sustainable Yield is, in turn, defined as the "largest long term average catch or yield that can be taken from a stock under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i).

families." *See* 142 Cong. Rec. H11418, 11439 (September 27, 1996) (statement of Rep. Studds). Indeed, Congress recognized that revisions to the Magnuson–Stevens act were critical in order to "put our fisheries back onto a sustainable path and literally avert an environmental catastrophe on a national level.... We are precariously close to fisheries failures in many of our most commercially important fish stocks, and it is imperative that we take immediate action if we are to avert disasters." *See* 142 Cong. Rec. S10794, 10811–12 (September 18, 1996) (statement of Sen. Kerry). *Id.* at 93–94. Under the modified Magnuson–Stevens Act, if the Secretary of Commerce determines that a fishery is overfished, the Secretary must notify the appropriate fishery council, and request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish. *See* 16 U.S.C. § 1854(e)(2); 50 C.F.R. § 600.310(e)(2). Once the council has been notified, it has one year to prepare a fishery management plan ("FMP") that ends overfishing and rebuilds the stocks. *See* 16 U.S.C. § 1854(e)(3); 50 C.F.R. § 600.310(e)(3).

When a council submits its FMP to the Secretary of Commerce, the Secretary (often acting through NMFS) must review the plan immediately to ensure its compliance with the ten "National Standards" and any other relevant provisions of the Magnuson–Stevens Act, as well as any other pertinent laws. *See* 16 U.S.C. §§ 1851(a)(1–10), 1854(a)(1); 50 C.F.R. §§ 600.310–600.355. Furthermore, the Secretary must also accept public comment on the plan for sixty days. *See* 16 U.S.C. § 1854(a)(1)(B). Lastly, the Secretary must approve, disapprove or partially approve the plan within thirty days of the end of the public comment period. *See* 16 U.S.C. § 1854(a)(3). "The Magnuson–Stevens Act's main thrust is to conserve the fisheries as a continuing resource through a mixed federal-state regime; the FMPs are proposed by state Councils but the final regulations are promulgated by the Secretary through the Fisheries Service." *Massachusetts v. Daley,* 170 F.3d 23, 27–28 (1st Cir.1999).

### ii *The ACFCMA*

Enacted in 1993, the ACFCMA reflects Congress' concern that the absence of one, central governmental management authority (as exemplified by the Magnuson–Stevens Act's oligarchic "councils") had resulted in "disparate, inconsistent, and intermittent State and Federal regulation that has been detrimental to the conservation and sustainable use of [fishery] resources and to the interests of fishermen and the Nation as a whole." 16 U.S.C. § 5101(a)(3). To rectify the situation, Congress crafted a new statutory scheme rooted in the Federalist model, wherein

> [t]he responsibility for managing Atlantic coastal fisheries rests with the States, which carry out a cooperative program of fishery oversight and management through the Atlantic States Marine Fisheries Commission. It is the responsibility of the Federal Government to support such cooperative interstate management of coastal fishery resources.

*Id.* at § 5101(a)(4). Congress envisioned a statutory model that would "support and encourage the development, implementation, and enforcement of effective interstate conservation and management of Atlantic coastal fishery resources." *Id.* at § 5101(b). A coastal fishery management plan ("CMP"), the equivalent of the Magnuson–Stevens Act's FMP, is the ACFC-

MA's term for a plan made by the Atlantic States Marine Fisheries Commission ("Atlantic Commission") for the management of a coastal fishery resource. *See id.* at § 5102(1). The ACFCMA explicitly addresses the issue of Federal and State cooperation in Atlantic coast fishery management, by providing for the development of federal regulations by the Secretary' of Commerce to support the Atlantic Commission's management efforts. *See id.* at § 5103(a).

The ACFCMA anticipates the statutory bi-presence of a Magnuson–Stevens Act FMP and an ACFCMA CMP with respect to regulation of EEZ, federally controlled waters: the power of the NMFS to implement federal EEZ regulations complementary to an ACFCMA management plan is contingent upon the absence of a Magnuson–Stevens Act FMP for the targeted fishery. *Id.* at § 5103(b)(1).[7] Furthermore, any regulations issued by the Secretary pursuant to the ACFCMA may only be implemented after consultation with the appropriate regional fishery council, and all regulations must comply with the National Standards of the Magnuson–Stevens Act. *Id.* at § 5103(b)(1)(B). These regulations "may include measures recommended by the [Atlantic] Commission to the Secretary that are necessary to support the provisions of the coastal fishery management plan." *Id.* The statute defines a "coastal management plan" as a plan for managing a coastal fishery resource, prepared and adopted by the Atlantic Commission, that:

(A) contains information regarding the status of the resource and related fisheries;

(B) specifies conservation and management actions to be taken by the States; and

(C) recommends actions to be taken by the Secretary in the exclusive economic zone to conserve and manage the fishery.

16 U.S.C. § 5102(1).

b. *History and Present Status of Lobster Conservation and Management*

Lobster conservation and management has traditionally occurred under the auspices of the Magnuson–Stevens Act: a lobster FMP was prepared by the New England Fishery Management Council ("NEFMC") (one of the eight regional councils created by the Magnuson–Stevens Act) and approved and implemented in 1983. *See* American Lobster Fishery; Removal of Regulations, 61 Fed.Reg. 13, 478 (1996) (to be codified at 50 C.F.R. § 649 (proposed March 27, 1996)). The choice to delegate lobster regulating authority to the NEFMC was a natural one, since American lobsters range geographically from Labrador to Cape Hattaras (although NMFS estimates that 80% of the lobster resource is found in state waters, while the remaining 20% is found in the EEZ). Record, 32, 2321–2356.

In 1993, however, the Stock Assessment Workshop Report # 16 ("SAW 16") disclosed that the American lobster stock was overfished. *Id.* at 25–65. Fishing mortali-

7. Again, the relevant language reads:
 In the absence of an approved and implemented fishery management plan under the Magnuson Fishery Conservation and Management Act, and after consultation with the appropriate [regional Magnuson–Stevens Act] Councils, the Secretary may implement regulations to govern fishing in the exclusive economic zone that are—

 (A) necessary to support the effective implementation of a coastal fishery management plan; and
 (B) consistent with the national standards [of the Magnuson–Stevens Act].
 16 U.S.C. § 5103(b)(1).

ty rates had increased by 45% from 1983 to 1991. *Id.* at 46. "[A]nnual landings of American lobster [were] at record high levels." *Id.* at 62. These increases were deemed in large measure the result of an increased fishing effort by inshore lobster pot fishermen. *Id.* Scientists from NMFS and state and private entities in the SAW 16 recommended that fishing mortality be reduced by 20% in the Gulf of Maine and 50% in Southern New England. *Id.* at 1960. A 1996 panel of independent stock assessment experts ("SAW 22") confirmed that the American lobster was overfished, and offered similar recommendations to curtail the fishing effort. *Id.* at 1960–61. "Overall the SAW states that fishing effort is intense throughout the range of the species and that the stock is overfished and vulnerable to collapse." *Id.* at 5448. Additionally, in 1999 NMFS found other indicia of dramatic lobster stock depletion: American lobster egg production was estimated to be 1–3% of what it would be in an unfished stock;[8] the bulk of the lobster harvest was comprised of female lobsters just above minimum legal size, which had likely not yet reproduced; roughly 70% of the entire fishable population was being harvested yearly; and the number of traps being set per boat had escalated exponentially, more than tripling on average between 1967 to 1998. *Id.* at 1961.

Despite repeated efforts to revamp the lobster FMP (e.g. the failed attempts of "Amendment 5" to manage and regulate more effectively the EEZ, *see* New England Fishery Management Council, Amendment 35 to the American Lobster Fishery Management Plan Incorporating a Final Supplemental Environmental Impact Statement: Volume I, at 2 (January 24, 1994)), it became increasingly apparent that the approach taken toward lobster conservation and management under the lobster FMP needed substantial alteration.

Thus it was that on March 27, 1996, NMFS proposed to withdraw the lobster FMP "because changed circumstances have called into question whether this FMP is consistent with the national standards of the [Magnuson–Stevens Act]." Record, 811. Instead, NMFS elected to reissue lobster conservation and management regulations under the ACFCMA that would be compatible with the interstate fishery management plan ("ISFMP," or what was termed "CMP" above). *Id.* at 811–12. This ISFMP, developed many years earlier by an interstate commission representing Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina, had, since the time of its inception in the late 1970s, operated jointly with NMFS to arrive at common goals and recommendations for the lobster fishery. *Id.* at 1952.

Once NMFS decided to withdraw the lobster FMP in March of 1996, the Atlantic Commission involved in the ISFMP approved what it termed "Amendment 3" to the ISFMP in December of 1997. *Id.* at 5443–5480. Amendment 3 sets forth particular gear and lobster take requirements in state waters, and specifies throughout its text the recommendations to the Secretary of Commerce for complementary action in federal waters. Atlantic States Marine Fishery Commission, Draft Amendment # 3 to the Interstate Fishery

---

**8.** In the lobster fishing context, "overfishing" has a special meaning correlative to the definition given at footnote 6 *supra*. Overfishing occurs when the lobster fishing mortality rate results in a reduction in estimated egg production per lobster to less than 10% of what egg production would be in a non-fished population. Record, 1960–61. Hence, egg production at 1–3% of a non-fished stock demonstrates a significantly overfished lobster stock. *See* Record, 56.

Management Plan for Lobster (1997); Record, 5443–5480. Amendment 3 also contains the following provision regarding the number of traps per vessel permitted in the offshore region of "Area 3:"

3.3.3.1 *Limits on the number of traps per vessel*

In Area 3, the Lobster Conservation Management Team, constituted under Section 3.4, shall develop a program to cap and then reduce effort, based upon historical participation, vessel size or other relevant criteria, for the purpose of achieving the egg production rebuilding schedule of Section 2.5.[9] The program may recommend alternative measures, besides effort control, that would achieve stock rebuilding targets. The program shall be presented to the ASFMC Lobster Management Board prior to July 1, 1998; and be designed for implementation effective January 1, 1999. If a program is not forthcoming, a limit of 2,000 traps shall be implemented on January 1, 1999.

Record, 5470. The Area 3 Lobster Conservation Management Team ("LCMT")

referenced above, composed of lobster fishermen and industry representatives (and of which plaintiff Campanale was a member, *see* Record, 5617), was formed by Amendment 3 to advise and make recommendations to the Atlantic Commission on management measures necessary to restore egg production in Area 3. *Id.* at 2184. Once the LCMT were to offer its recommendations, these would first be reviewed by the Atlantic Commission's Lobster Management Board (provided the recommendations were submitted prior to July 1, 1998). *Id.* at 5470. Next, the recommendations would face the scrutiny of the Atlantic Commission's Lobster Technical Committee, which would assess their ability to achieve the egg production milestones set by Amendment 3 for the year 2000. *Id.* at 2184. The 2,000 trap limit set by Section 3.3.3.1 of Amendment 3 was, thus, a default measure, that would take effect if the LCMT were not to present any timely and viable alternative. With respect to federally regulated waters, the Atlantic Commission recommended that the federal government promulgate regulations that were in conformity with the

9. The lobster egg rebuilding plan in Section 2.5 states, "This fishery management plan seeks to restore egg production from the American lobster resource in each of the management areas to greater than the overfishing definition within eight years from the adoption of the FMP, i.e. before the end of 2005." Record, 5465. The following chart represents the projected rebuilding process envisioned by Amendment 3:

**Egg Production ***

**(Percent of Maximum)**

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| Gulf of Maine | 3.25 | 3.25 | 4.375 | 5.5 | 6.625 | 7.75 | 8.875 | 10 + |
| Georges Bank & South | 1.68 | 1.68 | 3.07 | 4.46 | 5.85 | 7.24 | 8.63 | 10 + |
| SCCLIS [an area comprising "Area 2" and the Long Island Sound] | 2.21 | 2.21 | 3.51 | 4.81 | 6.11 | 7.41 | 8.71 | 10 + |

* egg production in 1998 & 1999 based upon adoption of v-notch protection [relating to egg-bearing females] and increased vent size; projected egg production from 2000 forward is based upon a requirement for proportional increases for each of the areas from the level of egg production in 1999.

repletion and lobster management objectives of Amendment 3. *Id.* at 5473.

Bearing in mind Amendment 3's lobster conservation scheme, NMFS issued a draft Environmental Impact Statement ("DEIS") on March 17, 1998. *Id.* at 1257–1373. NMFS, too, agreed with earlier assessments that "American lobsters are overfished throughout their range, from Canada to Cape Hattaras. .... [T]here is a significant risk of a sharp decline in abundance." Record, 1263. The DEIS considered various lobster management alternatives with an eye toward providing some consistency and compatibility with the Amendment 3 program. *Id.* at 1258. The DEIS examined several alternatives for the trap/pot lobster fishery: maintaining the status quo (Alternative 1); implementing Amendment 3's 2000 trap-cap limit for the year 2000 in the EEZ (Alternative 2); implementing a nearshore/offshore trap cap differential, with a buffer zone, and otherwise continuing all other management measures that were in place at the time (Alternative 3); a two-tier nearshore and offshore trap limit with a buffer zone (Alternative 4); nearshore fixed trap limits / offshore historic participation (Alternative 5) [10]; and banning fishing for and possession of lobsters altogether (Alternative 6). *Id.*

The parties now agree [11] that the Area 3 LCMT proffered its plan to the ASFMC Lobster Management Board on July 29, 1998, nearly one month after the deadline prescribed under the Atlantic Commission's Amendment 3. Record, 5684–5691. The tardiness of this submission is recognized in a letter dated July 16, 1998, from Bonnie Spinazzola, Executive Director of the Atlantic Offshore Lobstermen's Association ("AOLA," a private association of lobster fishermen and industry representatives), to Jon Rittgers, Acting Regional Director of NMFS. *Id.* at 5613. In the letter, Ms. Spinazzola states:

As I am sure you are aware, one of the many fishery management plans being formulated or updated is the plan for American Lobster. As you can well imagine, AOLA is extremely interested and concerned with management within federal waters.... For this reason, our Association, which is comprised of approximately 60% of the offshore fleet, formulated an industry driven plan which, we believe, will sustain the resource.... We are in the process of

10. The "historic participation" alternative considered by NMFS is described more fully at Record, 1300. For the federally regulated offshore fishery, this alternative would mean that

[f]ederal lobster permit holders ... will be given a percentage of their historic trap levels in Year One with a structured decrease in the maximum number of traps fished in Years 2–5. Under this alternative, permit holders possessing documentation (by the best available records) with regard to specific trap levels over a defined period will be assigned 75% of their average annual history based trap level as the initial annual allocation in Year One. In subsequent Years 2–5, annual allocations to federal lobster permit holders in [federally regulated, offshore waters] will be reduced by

10% of their initial Year One allocation on an annual basis. For example: A permit holder can document fishing 3000 traps during the defined documentation period. The Year One allocation would be 2250 traps (75% of 3000 traps). In subsequent Years 2–5 of the stock rebuilding period the permit holder would be required to reduce, on a yearly basis, the maximum number of traps fished by 225 traps (10% of 2250)....
*Id.* at 1300–1301.

11. In their memorandum, plaintiffs had argued that "[t]his [LCMT] plan was dated May 5, 1998, and ... met the time frame contained in Amendment 3...." Plaintiffs' Motion, P. 11 (citing Record, 1452). At oral argument, however, counsel for plaintiffs conceded that July 29, 1998 was the correct submission date.

meeting with State Directors, also members of ASMFC as well as individuals at NMFS.... **Unfortunately, however, as I am sure you are aware, the Area 3 LCMT, whose deadline to formulate a plan was July 1, has yet to organize it's (sic) first meeting.... We are concerned that in the absence of an Area 3 LCMT, or possibly with the very late start of the process, it will be nearly impossible to bring this or any plan for federal waters to the technical committee for evaluation prior to their scheduled meeting in August.**

Record, 5613 (emphasis supplied).

The text of the LCMT plan provides that "[n]o vessel shall be given an Initial Trap Allocation of more than 3,250 Traps, regardless of previous historical participation." Record, 5687. The LCMT plan also would implement a variety of measures to verify a particular vessel's historic participation in the lobster fishery (including submitting an audit of trap usage from an auditor approved by NMFS, or submitting a full season's logbook with or without support from a state or federal report). *Id.* at 5687–88. "Industry," the plan states, "by initially agreeing upon a starting cap of 3,250 traps, has forced some vessels to reduce effort by 58% *prior* to sliding scale trap reductions." *Id.* (emphasis in original). The referenced "sliding scales" would take the following form:

A. Reduction program trap. Each Area 3 trap allocation of greater than 1,200 traps will be reduced on a sliding scale basis over 5 years. Trap reductions will not go below a baseline of 1200 traps. Area 3 trap allocations of less than 1200 traps will remain at their initial qualifying level and will not be permitted to increase up from that number. *Id.*

On October 27, 1998, the Lobster Technical Committee of the Atlantic Commission sent their report regarding the Area 3 LCMT plan to the Lobster Management Board. Record, 5807–5815. The Technical Committee approved the Area 3 LCMT plan, though it had numerous questions and comments about the efficacy of various management provisions in the plan. *Id.* at 5810. The Atlantic Commission then met in April and May of 1999 "to begin public review of major components of the LCMT proposals, for ultimate consideration of approval by December 1999." Record, 1971.

In the meanwhile, NMFS, too, continued in its efforts to develop lobster fishing regulations for the EEZ compatible and complementary with the Atlantic Commission's state-directed measures. Record, 5473. Plaintiffs direct the court's gaze toward various pieces of correspondence indicating that several individuals involved in this process endorsed including the historic participation approach within the final rule.[12] Nevertheless, having consid-

---

**12.** Plaintiffs offer the following evidence of support for the historic participation alternative:

1. Record, 1506. A memorandum dated July 17, 1998, from Mr. Andrew Rosenberg, Regional Administrator for NMFS' Northeast region, to Mr. Rolland A. Schmitten, Assistant Director for Fisheries. The memo contains this lobster management recommendation for Offshore Permit Holders:
Year 1999: implement a 2000 trap limit or implement ASMFC's Area 3 CMT conservation equivalent recommendations if they

meet the EPG as identified in Table 1 of the ASMFC Plan, including allowing trap levels fished at some identified historic participation level....
Year 2000: implement an 1800 trap limit or conservation equivalent measures

. . . . .

2. Record, 1517. An undated email from a Mr. Harry Mears, Director of State, Federal, and Constituent Programs Office to Messrs. Kevin Chu, Bob Ross, Jon Rittgers, Andy Rosenberg, Teri Frady, Steve Murawski, and Fred Serchuk, disclosing

ered the comments received on its DEIS, NMFS published its proposed rule ("Proposed Rule") on January 15, 1999, without including the Area 3 LCMT historic participation plan. Record, 1831–51. The Proposed Rule provided the following:

> 7. Off-shore area trap limits and maximum trap size. NMFS proposes that Federal permit holders electing to fish in Area 3 be limited to no more than 2000 traps in 1999 and 1800 traps in 2000. Further reductions of this trap limit may be required in the future if the egg-rebuilding schedule is not met by these limits. . . .

Record, 1835. At this time, the Atlantic Commission had not yet approved the Area 3 LCMT plan, and it was not included by NMFS in the Proposed Rule. However, during the public comment period (which ran from January 11, 1999 to February 26, 1999), "[f]our hundred and seventy-eight commenters requested that NMFS delay implementation of management measures until the Commission approve[d] the LCMT management plan." Record, 2325.

The next step taken by NMFS was to publish a Final Environmental Impact Statement ("FEIS") on May 10, 1999. Then, on August 3, 1999, the Atlantic Commission at long last approved the Area 3 LCMT plan, terming it "Addendum 1"[13] to

that NMFS was considering extending the time period for review of the Area 3 LCMT plan:

The Proposed Rule will as envisioned allow for consideration of the Area 3 proposal in 1999. For this to happen, however, it must first be reviewed and endorsed by the ASFMC Technical Committee and Board, then forwarded to NMFS for final consideration. The current plan is to allow 30 days after publication of the Proposed Rule to accommodate this ... otherwise the 2000 default kicks in.... The ace card in all of this will be the requirement to meet the FMP objectives in accordance with the time frame in Table 1 of Amendment 3.

Amendment 3 of the ISFMP. Record, 6183. The Atlantic Commission also recommended in Addendum 1 that NMFS implement the substance of the Area 3 LCMT plan. Record, 6194.

Based on the Atlantic Council's recommendation, NMFS published a notice of proposed rulemaking on September 1, 1999. Record, 2183–2185. The following statements by NMFS demonstrate that NMFS had begun to formulate a methodology for implementing a historic participation plan at some future date:

> Proposed rulemaking may include potential eligibility criteria based on historical participation and/or historical trap levels in [Lobster Conservation Management Areas].... Consideration of a control date[14] does not commit NMFS to any particular management regime or criteria.... Fishermen are not guaranteed future participation in any management area, regardless of their entry date or intensity of participation in the fishery.

Record, 2184. On December 6, 1999, NMFS published its final rule ("Final Rule"), implementing the flat trap limit of 1,800 traps to begin in May of 2000, and elected to disregard the historic participation alternative. Record, 2321–2356 (2324). Defendant argues that NMFS'

**13.** Addendum 1 concerned itself with more than simply the Area 3 LCMT plan, but only this aspect of Addendum 1 is relevant to the instant inquiry.

**14.** A "control date" is the final day that may be used in setting qualifying criteria for obtaining a new limited access fishing permit. Defendant's Motion, P. 15. NMFS sets a control date in order to eliminate "speculative fishing," that is, padding one's numbers in order to increase one's quota. *Id.;* Record, 4192.

own rulemaking process was so advanced by the time the Atlantic Commission recommended the Area 3 LCMT plan, that it would have been utterly unfeasible for NMFS to subject the Atlantic Commission's new recommendation to the scrutiny required under federal rulemaking procedures:

> NMFS had nearly completed its work on the lobster rulemaking, and consideration of new measures would have required the following measures required (sic) under an [Administrative Procedure Act] rulemaking: revocation of the existing Proposed Rule; rewriting the DEIS, Regulatory Impact Review ("RIR") and initial regulatory flexibility analysis ("IRFA"); solicitation of public comment on a new DEIS for 45 days; issuance of a new proposed rule for at least 30 days of public comment; development and clearance through the Office of Management and Budget of a new Paperwork Reduction Act package; analysis of public comments; review under the Endangered Species Act; resubmission of the coastal zone consistency determinations to each state on the East Coast; preparation of a new final rule that responds to the new round of public comments; issuance of a new final regulatory impact analysis ("FRFA"); and clearance of the final rule through the NMFS regional office, headquarters, the National Oceanic and Atmospheric Administration, the Department of Commerce, and the Office of Management and Budget. This process, especially for an allocation system based on historic participation in such a traditional and valuable fishery as American lobster, could take 1–2 years.

Defendant's Motion, P. 12. NMFS believed that such a "continued delay for full consideration of the LCMT plans until a date yet to be determined by the Atlantic States Commission jeopardizes needed management measures to protect the lobster resource." Record, 2325.

Plaintiffs argue that "[a]s late [as] May through June of 1999 NMFS was still indicating that the Area 3 [LCMT] plan would receive consideration and could potentially be adopted by January 1, 2000." Plaintiffs' Motion, P. 14. "Again, however, despite all of these representations to the contrary," complain plaintiffs, "when the final rule was released, NMFS took the easy way out and did not include [the Area 3 LCMT plan] in its provisions." *Id.* at 14–15.

*Issues*

1. What is the standard of review for actions seeking judicial review of administrative regulations promulgated pursuant to the ACFCMA and the APA?

2. Was the decision to promulgate the uniform trap cap regulation arbitrary and capricious, because defendant did not first consider the historic participation of fishing vessels in the lobster fishery, or because a regulation reflecting historic participation more effectively serves lobster conservation and management goals?

3. Did defendant exceed his statutory authority under the ACFCMA in promulgating the regulations, because defendant did not first consult with the appropriate councils, or because the regulations are not compatible with the "effective implementation of a coastal fishery management plan?"

4. Was the decision to promulgate the uniform trap cap arbitrary and capricious, because it contravenes the mandates of national standards 1, 2, 4, 6, and 8 of the Magnuson–Stevens Act?

5. Was the decision to promulgate the uniform trap cap arbitrary and capricious, because this regulation does not

comport with the requirements of the RFA?

6. Was the decision to promulgate the regulations in excess of the defendant's statutory authority under the ACFCMA, because there was already a lobster FMP in place pursuant to the Magnuson–Stevens Act?

7. Was the defendant's decision to promulgate 50 C.F.R. § 697.4(a)(7)(v) arbitrary and capricious, an abuse of discretion, and in violation of the defendant's statutory authority?

*Analysis*

 a. *Standard of Review for Regulations Issued Pursuant to the ACFCMA and the APA*

■ The challenged regulations were promulgated by NMFS and the Secretary of Commerce pursuant to their authority under the ACFCMA. *See* 16 U.S.C. §§ 5101–5108. The parties are in agreement that the regulations, as promulgated under the ACFCMA, are governed by the provisions for judicial review of the APA, pursuant to 5 U.S.C. §§ 701–706. Plaintiffs' Motion, P. 2; Defendant's Motion, P. 5. Unlike in the Magnuson–Stevens Act, however, there is no specific provision within the text of the ACFCMA that calls for judicial review pursuant to §§ 701–706 of the APA. *See* 16 U.S.C. § 1855(f) (section for Judicial Review in the Magnuson–Stevens Act, which has no counterpart in the ACFCMA). When Congress does not make explicit in a particular statute what standard of review a court should employ in reviewing the decisions of an administrative agency, the appropriate standard of review is then found under the APA. *See Dubois v. United States Department of Agriculture,* 102 F.3d 1273, 1284 (1st Cir. 1996) (federal statutes which do not specify a standard of review are governed by the APA standards of judicial review); *Oregon Natural Resources Council v. United States Forest Service,* 834 F.2d 842, 851 (9th Cir.1987) (where Congress does not include a section for judicial review within an enactment, judicial review under the APA is " 'ordinarily inferred' and appropriate").

Title 5 U.S.C. § 706(2) provides that a reviewing court shall

hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2)(A–F).

■ An important distinction must now be drawn. Plaintiffs bring two categories of claims before this court. First, plaintiffs assert that the defendant exceeded his authority, under the provisions of the ACFCMA, when he issued the challenged regulations: this genre of claim encompasses Issue 3 (the allegation that the defendant did not confer with the appropriate councils prior to issuing the regulations) and Issue 6. Second, plaintiffs bring claims alleging that the defendant acted arbitrarily and capriciously by selecting

the lobster conservation and management options that he did: Issues 2, 4 and 5 fall under this category (Issue 7 is a hybrid, since plaintiffs claim that 50 C.F.R. § 697.4(a)(7)(v) is arbitrary and capricious and in excess of defendant's statutory authority). This second grouping derives its source not from an allegation of improper statutory usurpation. by the defendant; rather, plaintiffs claim that the decisions made by the defendant, which were within his statutory authority, were rooted in an arbitrary or capricious rationale. The distinction is critical because the first type of claim warrants *de novo* review by the court, while the second affords the agency decision a distinct degree of deference. *North Carolina Fisheries Association, Inc. v. Brown,* 917 F.Supp. 1108, 1113 (E.D.Va.1996) ("The question of whether the Secretary exceeded his authority under the statute ... is a question of law that is reviewed *de novo*.").[15] Thus, for those allegations decrying an arrogation of statutory authority pursuant to the ACFC-MA, this court should employ a *de novo* standard of review.

 By contrast, the court must defer to the interpretation of a statute by the agency charged with administering it, and the standard under 5 U.S.C. § 706(2)(A) presumes the agency action to be valid. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Southern Cal. Edison Co. v. F.E.R.C.,* 770 F.2d 779, 782 (9th Cir.1985). Although the court's inquiry is to be searching and careful, the ultimate standard of review for this second category is a narrow one. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. The role of the reviewing court is to " 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.' " *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (citing *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814). "A reviewing court may decide only whether [the Secretary's] discretion was exercised rationally and consistently with the standards set by Congress ... and may not substitute its own judgment as to values and priorities for that of the Secretary." *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977). With respect to a court's review of a specific regulation adopted by an agency pursuant to its delegated authority,

[the] regulation will be found to be arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'

*Connecticut v. Daley,* 53 F.Supp.2d 147, 157 (D.Conn.1999) (citing *Southeastern Fisheries Ass'n, Inc. v. Mosbacher,* 773

---

**15.** The *North Carolina Fisheries* court amplified on this dichotomy:

The normal deference accorded to agency interpretation of statutes under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is not appropriate where, as here, Congress has "directly spoken" to the question of the statute itself. *Id.* at 842, 104 S.Ct. at 2781. *See Stupak–Thrall v. United States,* 70 F.3d 881 (6th Cir.1995) ("question of whether an agency has been granted authority to issue rules and regulations is a question of law and subject to *de novo* review").

It is only when Congress has not spoken directly to a particular issue in a statute, or where a statute is silent or ambiguous on a particular issue, that the court must defer to a reasonable agency interpretation. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

F.Supp. 435, 439 (D.D.C.1991)) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443))). Where an agency action is taken upon an administrative record, it must be reviewed based only on that record, subject to limited exceptions. *Massachusetts v. Daley*, 170 F.3d at 27 n. 4 (citing *Sierra Club v. Marsh*, 976 F.2d 763, 772–73 (1st Cir.1992)).

■ The Secretary's assessment of which fishery conservation and management measures would be in the nation's best interest is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *National Fisheries Institute, Inc. v. Mosbacher*, 732 F.Supp. 210, 223 (D.D.C.1990). Therefore, "[f]or a court to set aside the Secretary's action, it 'must find that the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious.'" *Connecticut v. Daley*, 53 F.Supp.2d at 158 (citing *J.H. Miles and Co., Inc. v. Brown*, 910 F.Supp. 1138, 1146 (E.D.Va.1995)). "When a regulation is not adequately supported, the normal practice is to set it aside pending further proceedings," though the court may alternatively order a remand to the agency for further explanation while leaving the regulation in force. *Massachusetts v. Daley*, 170 F.3d at 32 (citing *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)).

 b. *Is the uniform trap cap an arbitrary and capricious regulation because defendant adopted it without regard to historic participation in the American lobster fishery?*

■ Plaintiffs first claim constitutes the following allegation:

A review of the entire administrative record will show that, throughout the entire course of the discussion, meetings, memos, E-mails, and other documents involved in the process of developing the regulations, historic participation in the offshore fishery as the measure for capping and reducing effort had always been considered a viable alternative. In fact, at various times in the record it can be seen that certain individuals or branches of NMFS were in favor of a trap cap based upon historic participation. Why the historic participation option was rejected is not adequately explained anywhere on the record.

Plaintiffs' Motion, P. 8. Defendant concedes that "[i]t is undisputed that trap limits based on historic participation were and are considered a viable alternative for management of the offshore fishery." Defendant's Motion, P. 15. Indeed, once a management alternative based on historic participation was recommended by the Atlantic Council on August 3, 1999, defendant states that it "published an Advanced Notice of Proposed Rulemaking ('ANPR') on trap limits based on historic participation ... [and] published a Draft Supplemental EIS ('DSEIS') on November 24, 2000, that examines additional ways to reduce fishing effort, including trap limits based on historic participation." *Id.* (borne out at Record, 2143).

However, defendant argues that the historic participation management plan was not a viable and complete alternative at the time the defendant issued the Proposed Rule, and that

significant unresolved issues remained at the time the Final Rule was published.... [B]oth NMFS and the Commission considered resolution of these issues to be necessary before implementation of trap limits based on historic participation, and both entities were also concerned that the LCMT

Plan did not reflect an industry consensus.

*Id.* Thus, defendant argues, the tardiness of the submission of a plan based on historic participation coupled with the lack of industry consensus on the plan[16] approved by the Area 3 LCMT on July 29, 1998 (approved, incidentally, in one meeting) bespeaks an eminently reasonable decision by the defendant to disregard the historic participation alternative in its Final Rule of December 6, 1999.

I am inclined to agree with defendant's position, particularly given the highly deferential standard of review this court is bound to apply. *See Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. The text of the ACFCMA requires a cooperative effort between the federal (here, NMFS) and state (the Atlantic Council) authorities in order to conserve and manage geographically wide-ranging fisheries, such as the lobster fishery, more effectively. NMFS complied with this statutory mandate by adhering to the schedule proposed by the Atlantic Commission in its Amendment 3 recommendation for Area 3, the offshore waters. The schedule required that the Area 3 LCMT propose a plan for lobster conservation to the Lobster Management Committee of the Atlantic Commission *by July 1, 1998,* to be ready for implementation on *January 1, 1999.* The Record reflects, and the parties now agree, that the Area 3 LCMT plan was not submitted to the Lobster Technical Committee until nearly a month after the deadline, on July 29, 1998. Amendment 3's explicit language contemplates this very sort of tardiness: "If a program is not forthcoming, a limit of 2,000 traps shall be implemented on January 1, 1999." Record, 5470. NMFS evidently made the judgment that the Area 3 LCMT plan was not "forthcoming," since the LCMT failed to meet the schedule set out in Amendment 3. NMFS had delayed implementation of its Final Rule as late as June 18, 1999, frustrated that the Atlantic Commission had not yet decided whether or not to approve the Area 3 LCMT plan. Record, 2129. The Atlantic Commission

16. Defendant lists the following areas of unresolved ambiguity with respect to the Area 3 LCMT plan, as it existed after it had been approved the Atlantic Commission on August 3, 1999:

... NMFS was justifiably concerned that many unresolved legal, management, and data issues remained in the Area 3 proposal. For example, the process of selecting and qualifying a neutral auditor to verify the qualifying vessels remained unresolved. The Plan relied heavily on "soft" data, such as affidavits and trap purchase receipts that are difficult to verify, and other "hard" data that provided information that was verifiable but not necessarily the right data for historic participation verification purposes. Some of this information is not even available at the state level, since many states lack information regarding historical participation in the lobster fishery. The Rhode Island Department of Environmental Management ("DEM") indicated to NMFS no data had been collected by the state on lobster fishing location or traps fished by Rhode Island resident lobstermen. Therefore, the state can provide no data regarding the historical participation of its fishermen in the lobster fishery. Due to these unresolved issues, NMFS reasonably feared that "industry-wide acceptance could be hard to achieve if the Area 3 proposal is perceived as a request for an award of territory exclusive rights to a small number of offshore lobstermen." The [Atlantic] Commission also continued to express concern regarding the details of the historic participation plan. Although it approved the Area 3 LCMT Plan in August, 1999, as part of Addendum One, the Commission conceded that further meetings were needed to discuss the limitations and procedure of a historic participation system. This was especially true because the Areas 3, 4, 5, and 6 LCMTs all proposed historical participation schemes, but with different reference periods and processes for determining historical levels of traps....

Defendant's Motion, P. 17.

had delayed its decision regarding the Area 3 LCMT plan yet again, this time "tentatively scheduled no earlier than August 1999." *Id.* Given the clear indications of depleted lobster stock, the need for rapid action to rectify a degenerating problem, and the seemingly interminable delay of the Atlantic Commission in deciding whether or not to approve the Area 3 LCMT plan, this court is loath to rule that defendant's decision to proceed with its own lobster conservation and management rulemaking in December of 1999 is arbitrary and capricious.[17]

Plaintiffs raise five principal arguments in support of the notion that the defendant acted arbitrarily and capriciously by failing to consider the historic participation alternative in the Final Rule. First, plaintiffs point to the correspondence of July, 1998, between Mr. Rosenberg, Regional Administrator for NMFS' Northeast region and Mr. Schmitten, Assistant Director for Fisheries, referenced above at footnote 12(1). In his letter, Mr. Rosenberg recommended "[i]mplement[ing] a 2,000 trap limit **or** implement[ing] ASMFC's Area 3 CMT conservation equiv-

alent recommendations ... including allowing trap levels fished at some identified historic participation level" for 1999, and "[i]mplement[ing] an 1,800 trap limit **or** conservation equivalent measures" for 2000. Record, 1503 (emphasis supplied). Plaintiffs claim that Mr. Schmitten "concurred in this recommendation," but do not indicate any evidence in the Record to support this assertion. Plaintiffs' Motion, P. 12. Even if this court were to assume that both Schmitten and Rosenberg were in agreement on this point, this agreement would not assist plaintiffs' cause. Mr. Rosenberg stated that a historic participation plan was one recommended option; also recommended was a plan implementing a 2,000 and 1,800 flat trap cap for 1999 and 2000 respectively. It was perfectly rational, therefore, for defendant to select the flat trap caps, especially when other plans based upon historical participation were not forthcoming or were unready for implementation. Second, plaintiffs direct the court's attention to "an undated email from August of 1998," written by Harry Mears, referenced above at footnote 12(2). Plaintiffs' Motion, P. 12. In this email,

---

17. There is also evidence that even after the Atlantic Commission approved Addendum 1, which would implement the Area 3 LCMT historic participation plan, it did not simultaneously approve the "gauge increase" element (or minimum carapace size element) of that plan. Defendant stated in its papers and at oral argument that this element, which established a minimum size limit for catchable lobsters, was crucial to the effective implementation of the Area 3 LCMT plan. Defendant's Motion, P. 18. The Record indicates that at a meeting of the Atlantic Commission on October 27, 1998, to assess, among other things, the likely effect of the Area 3 LCMT plan, there was considerable doubt whether the planned trap reductions, without more, would increase egg production. Record, 5781. The following comments are representative of the Atlantic Commission's appraisal of the Area 3 LCMT plan with respect to egg production:

Mr. White: Are we able to quantify now that a trap reduction will increase egg production?

Mr. Lobue: I think that that formula will be reviewed before the next SARC. Like I said, we got it two days before the meeting

Ms. Graulich: What they tried to quantify is that an effort reduction will give us a specific level of fishing mortality which translates to a higher rate egg production, so it's not a direct link.

. . . . .

Ms. Graulich: .... The egg production model wasn't used for that assessment. It was a separate way of assessing what kind of reduction in fishing mortality would save and then looking up that fishing mortality in the model and see whether egg reduction (inaudible). So it's indirect. And it's still something that needs to be reviewed.

Record, 5781.

Mr. Mears represents that, assuming that the Area 3 LCMT plan received approval from the Atlantic Commission's Lobster Technical Committee and Lobster Board and were forwarded to NMFS, "[t]he Proposed Rule will as envisioned allow for consideration of the Area 3 proposal in 1999.... The current plan is to allow 30 days after publication of the Proposed Rule to accommodate this ... otherwise the 2,000 default kicks in." Record, 1517. Plaintiffs make the utterly unwarranted leap of logic to suggest that this email constitutes a binding assurance that the historical participation alternative would be integrated within the Final Rule. When Mr. Mears wrote this missive, it is quite possible that NMFS' "current plan," in August of 1998, was one which contemplated the theoretical incorporation of the Area 3 LCMT plan. But the fact that the Area 3 LCMT historic participation alternative was not considered or ultimately made part of the Final Rule is not relevant to the present inquiry. Plans change, but that is not necessarily an indicium of arbitrariness and capriciousness. Defendant has given a rational explanation for its decision not to incorporate that alternative, based on the late submission and approval of the plan, the significant industry dissension regarding its application, and the considerable doubts expressed by NMFS regarding the LCMT plan implementation. Third, plaintiffs argue that the uniform trap cap does little if anything to ameliorate the plight of the lobster fishery. Plaintiffs cite for support the memorandum of Michael P. Sissenwine, Science and Research Director at NMFS, dated October 8, 1998. Record, 1586–1590. In this memorandum to Harry Mears, Mr. Sissenwine criticizes the uniform trap cap, stating that the "proposed rule does little to address the overfished condition of the lobster resource, and even less to address stock rebuilding." Record, 1586. Sissen-

wine goes on to say that the Proposed Rule is ineffective because it does not prevent lobstermen who historically used less than 2,000 or 1,800 traps from increasing their trap numbers. *Id.* Furthermore, Sissenwine states that "the average number of traps fished by offshore vessels is approximately 1,300 traps," which he believes indicates that a cap of 2,000 or 1,800 would not assist in lobster stock repletion. *Id.* at 1589. Finally, he states that

[t]aken as a whole, these measures provide a cap to future effort expansion but provide little or no assurance that the current overfished status of the resource will be stabilized or even reversed. Thus, there appears to be little economic gain relative to the status quo other than providing some measure of surety that the current status will not get worse.

*Id.* Defendant, too, has offered scientific proofs in support of the uniform flat trap. He points first to the SAW 16, SAW 22, and the Bannister Report of 1996, all of which concluded that the lobster resource is overfished, that egg production is dramatically and dangerously low, and that lobster trap caps are presently not implemented. *See* Record, 1961. Defendant also states:

According to data presented at the "Lobster Summit" sponsored by the New England Aquarium in Boston, Massachusetts, in February 1997 ... NMFS estimates that 26% and 27.4% of Federal permit holders in the nearshore and offshore (Area 3) EEZ fisheries fished more traps in 1995 than Federal regulations will allow under proposed regulations. Since expansion in numbers of traps has likely increased since 1995, the resulting benefits of trap limits on achieving reductions in lobster fishing mortality are probably underestimated.

Record, 1972. NMFS did acknowledge that "the conservation benefits of trap

limits and trap reductions are difficult to quantify, due to such factors as gear efficiency and saturation, and changes in fishing practices." *Id.* Additionally, NMFS recognized and addressed the criticism that "Federal permit holders who previously fished fewer traps in the absence of a trap limit would decide to increase fishing effort up to that limit once that limit was established." *Id.* Nevertheless, NMFS avers that "[t]he capping and reduction of fishing effort is an important step in reducing lobster fishing mortality *at some threshold level,* which when combined with other management measures, will increase the effectiveness of those measures and achieve ISFMP objectives to end overfishing and rebuild stocks of American lobster." *Id.* (emphasis supplied). NMFS also analyzes its own historical participation alternative (Alternative 5 in the DEIS and FEIS), and concludes that "[t]he number of lobster traps under this alternative will likely increase in the offshore EEZ waters.... [I]t would likely contribute to higher lobster mortality levels, thereby prolonging the achievement of lobster management goals throughout the range of the resource." *Id.* at 1997. Sissenwine, himself, was of the opinion at the time of his memorandum that the Area 3 LCMT plan presented significant shortcomings, as evidenced by the following criticism of that plan:

> The ASFMC's Lobster Conservation Management Teams (LCMTs) (sic) proposals have so far done little, if anything, to reduce the number of traps in any of the areas except offshore Area 3.... Most of the increased effort in the EEZ (perhaps even fishery-wide) has occurred in the nearshore region (3–30

miles). Currently, there are about 64 trip boats fishing the "true" offshore region (40 miles ☞ from shore). Effort continues to increase in the 3–30 mile region, and boats have been moving further out with more gear each year. The proposed rule "caps" effort in the offshore region at 2000 traps per boat, and reduces this cap to 1800 after one year. The current proposal from the Area 3 LCMT is for a tiered set of trap caps/reductions that begin at about 1850 traps per boat (an average) [18] and then are steadily reduced to 1500 per boat in five years. A limit to entry in the fishery is assumed thereby ensuring that an increase does not occur in the overall number of traps. However, this proposal addresses only effort reduction in the "true" offshore area (Area 3), but not in the 3–30 mile zone (Areas 1, 2, 4, 5 and Outer Cape Cod).

*Id.* at 1587. Defendant also states that the status of the lobster stock would be reevaluated after the year 2000 to determine whether or not the trap limits under the Final Rule are having the desired lobster conservation and management effects. Record, 1970. Fourth, plaintiffs emphasize the criticisms of Eric Thunberg, in his letter to Harry Mears dated October 15, 1998, discussing the economic impact of the proposed rule on fishing vessels:

> The potential economic impacts of each of the management measures that will apply to entities engaged in harvesting American lobster are not readily quantifiable. Without mandatory reporting no data is available to determine numbers of traps fished, productivity, or firm revenues and costs....
>
> *Trap Caps.*.... Although not always the case, it is generally recognized that vessels in excess of 50 feet are required to

**18.** In fact, the upper limit for number of traps under the Area 3 LCMT plan for the first year is 3,250 traps.

prosecute the offshore fishery.... [I]t seems likely that approximately 30% of all trap vessels in 1997 will have to reduce the numbers of traps fished in order to come into compliance with the proposed trap caps by the year 2000.... The economic impacts of trap reductions will depend upon the relative magnitude of the reduction and whether or not competing entities increase the number of traps they fish. Reducing the number of traps fished is equivalent to giving up territory. Firms that will be faced with relatively small reductions will not be forced to give up fishing area. Firms that will be faced with moderate to large reductions will be giving up more territory. If competing firms do not seek to take over the lost area, the reducing firm may be able to maintain profitability by making the adaptations described previously. However, if firms do take over lost territory either by shifting existing traps or by increasing traps than (sic) these competing firms will be able to increase their own profitability at the expense of the reducing firms.

Record, 1594. This is hardly a wholehearted condemnation of the Final Rule. It proposes two hypothetical scenarios, one of which would, indeed, favor implementation of the uniform trap caps. It also indicates that as many as 30% of all trap vessels in 1997 would have been affected by the 2,000 / 1,800 limitation.

■ The court takes note of the difference of opinion concerning the Final Rule, and the general lack of consensus about the best *modus operandi* to approach the problems of lobster conservation. It also recognizes that it is difficult to predict with any precision how the Final Rule issued by the defendant will impact, positively and/or negatively, the repletion of the lobster stock. But judges are not marine biologists nor have they, in the main, any experience in lobster management. Defendant

has provided substantial Record support to indicate that his implementation of a uniform trap cap at some threshold level was a reasonable and rational decision, and that it will have the effect of limiting the number of traps fished for a sizable proportion of the lobster fishing industry. *See Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 109 (1st Cir.1997) ("Subject, of course, to statutory constraints, policy choices are for the agency, not the court, to make. Even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its own judgment for that of the agency."). As explained by the First Circuit:

An agency rule is arbitrary and capricious if the agency lacks a rational basis for adopting it—for example, if the agency relied upon improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.

*Id.; See A.M.L.*, 107 F.Supp.2d at 97. Such is not the case here; while plaintiffs have demonstrated that there is a difference of opinion among some individuals about the efficacy of the uniform trap cap, they have not demonstrated that adoption of the rule, with or without consideration of the historical participation alternative as expressed in the Area 3 LCMT plan, was an arbitrary and capricious act.

c. *Did defendant exceed his statutory authority under the ACFCMA in issuing the regulations, because he did not first consult with the appropriate councils or because the uniform trap cap is incompatible with effective implementation of a coastal fishery management plan?*

■ Plaintiffs argue that defendant violated the following provisions of 16 U.S.C. § 5103(b):

(1) In the absence of an approved and implemented fishery management plan under the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), *and after consultation with the appropriate Councils,* the Secretary may implement regulations to govern fishing in the exclusive economic zone that are—

(A) *compatible with the effective implementation of a coastal fishery management plan*

. . . . .

16 U.S.C. § 5103(b)(1) (emphasis supplied). "The term 'Councils' means Regional Fishery Management Councils established under section 1852 of this title." 16 U.S.C. § 5102(5). Plaintiffs state that "[i]n this case the two applicable councils would be the New England Fishery Management Council ['NEFMC'] and the Mid–Atlantic Fishery Management Council ['MAFMC']." Plaintiffs' Motion, P. 17. Plaintiffs argue that because no "consultation" took place between the Secretary and these councils, defendant exceeded his statutory authority under the ACFCMA when he issued the regulations. Plaintiffs do concede that while "[t]here are letters from the councils contained within the administrative record" these are not a "consultation" within the meaning of the ACFCMA. *Id.* Plaintiffs cite to no case, merely offering up the American Heritage Dictionary's definition of "consultation," which plaintiffs believe implies "some sort of meeting and discussion.... If there is no consultation between the Secretary and the appropriate councils, then the process used to adopt the regulation is flawed." *Id.* at P. 18. Defendant makes no written response to this argument, and had little to say at oral argument on this issue.

There is evidence that a copy of the FEIS was forwarded to Paul Howard, the Executive Director of the NEFMC and to David R. Kiefer, Executive Director of the MAFMC, Record, 2055, and there is further evidence that "NMFS received several hundred written and oral comments on the American Lobster DEIS during the public comment period" from March 27 through May 19, 1998, some of which were from the NEFMC and the MAFMC. Record, 2060–61. "All of the comments," NMFS states, "were carefully considered." *Id.* Furthermore, there are five comments on the DEIS authored in part by the NEFMC (Comments 11, 12, 27, 59, and 60, all at Record, 2106–2115) to which NMFS responded directly, some of which dealt with the uniform trap cap. Plaintiffs do not believe these sorts of involvements by NEFMC and MAFMC constitute adequate "consultation" under the ACFCMA, but they do not offer any legal basis for this belief. No precedent or statutory history is presented—only their own general sense that "consultation" seems to imply something more than what occurred here.

The case of *North Carolina Fisheries v. Brown,* 917 F.Supp. 1108 (E.D.Va.1996) was cited by plaintiffs' counsel at oral argument and bears peripherally on this issue. There, the Secretary of Commerce, acting pursuant to the ACFCMA, issued a proposed rule that would have prohibited the possession in or harvest from the EEZ of Atlantic Coast weakfish. *Id.* at 1110. After NMFS had conducted nine public hearings and had received various written comments on the proposed rule, the Secretary issued a proposed final rule. Plaintiffs, a group of corporations engaged in the weakfish fishery, alleged (among other claims) that the defendant had exceeded his statutory authority because he had promulgated the regulations before the Atlantic Commission had recommended any action for the Secretary to take in the EEZ. *Id.* at 1115. "Because the current coastal fishery management plan for weakfish con-

tains no such recommendation, the [plaintiffs'] argument goes, the Secretary has no authority to regulate weakfish in the EEZ (in the absence of regulations under the Magnuson Act)." *Id.*

In ruling that the Secretary had exceeded his statutory authority under the ACFCMA, the court reasoned:

A straightforward reading of the law indicates that [plaintiffs'] position is the correct one. The statute requires that a "coastal fishery management plan" contain three elements—information on the stock, specific conservation measures for the states to implement, and "recommended actions" to be taken by the Secretary. Without these three elements, including the "recommended actions" to be taken by the Secretary, any "coastal fishery management plan" issued by the Atlantic Commission is not, under the terms of the statute, a qualifying plan.... The Court cannot say that this result is "demonstrably at odds" with the intent of the drafters, or produces an absurd result. The primacy of the states, acting through the Atlantic Commission, in this statutory scheme is self-evident. The Act expressly provides that the "responsibility for *managing Atlantic coastal fisheries rests with the States* ... [i]t is the responsibility of the Federal Government to *support* such cooperative interstate management of coastal fishery resources."

*Id.* at 1115–1117 (emphasis in original). As in that case, plaintiffs here assert that the defendant exceeded his statutory authority under the ACFCMA; but here, it is the lack of adequate "consultation" with the NEFMC and MAFMC that plaintiffs complain of, not the absence of a recommendation by the Atlantic Commission (which is clearly present within Amendment 3). The situations are not the same, both because there is sufficient evidence in the Record that NEFMC and MAFMC gave their opinions or at least were afforded the opportunity by NMFS to give their opinions on the proposed regulations, and because, unlike in *North Carolina Fisheries,* the underlying statutory ideology of the ACFCMA—that of state-influenced management of the lobster resource supported by the Federal government—is not offended by the perhaps less than exhaustive "consultation" with NEFMC and MAFMC (neither of which are state-managed bodies). Therefore, the defendant did not exceed his statutory authority by issuing the regulations: NEFMC and MAFMC had adequate opportunities to present their views to NMFS.

Next, plaintiffs state that the uniform trap cap is "not compatible with the effective implementation of a coastal fishery management plan." Plaintiffs' Motion, P. 18. They argue that

what NMFS has done is ignore the specific portions of the coastal fishery management plan and adopted (sic) its own default limits without regard to historic participation. Clearly such an action cannot be deemed to be compatible with the "effective implementation of a coastal fishery management plan."

*Id.* at P. 19. This, however, is an inaccurate statement. NMFS did not adopt "its own default limits." It adopted the default limit of 2,000 traps for 1999 contained in the text of Amendment 3, adopted by the Atlantic Commission. The Atlantic Commission further recommended that NMFS adopt regulations that were in conformity with the repletion and lobster management objectives of Amendment 3, which NMFS did by adopting the default measure proposed by Amendment 3 and an additional default measure of 1,800 traps for 2000 in the event that an Area 3 LCMT plan should still not be forthcoming by that time.

Plaintiffs point to a letter dated June 28, 1999, from John Dunnigan, the Atlantic Commission's Executive Director, to Robert Ross of NMFS. Plaintiffs' Motion, P. 19. In this letter, Mr. Dunnigan states the following:

> The Commission is pleased to see the gaps between the state and federal approach to lobster management continue to narrow.... The FEIS implies that the Final Rule will adopt the default trap limits from Amendment # 3 during 1999 and 2000, which would be a step backwards as the Commission continues to move the lobster management program forward.... The final EIS states that "trap limits will complement existing controls on fishing effort in water of Maine and Massachusetts." However, the trap limits for Areas 4, 5 and 6 will be inconsistent with eight other states and the trap limits for Area 3 will be inconsistent with all eleven states. Amendment # 3 acknowledges the need for cooperative management by lobster management area, not by state-federal waters.... The Commission requests that implementation of the final rule be delayed until Addendum 1 is adopted in August and the Commission submits written recommendations for lobster management in federal waters. But if NMFS must implement final rules prior to the adoption of Addendum 1, the Board strongly recommends that NMFS implement the ASMFC Area 3, 4, and 5 plans, as presented in the Public Hearing Document, as an interim measure pending the adoption of Addendum 1.

Record, 2134–35. This letter represents a distinct and palpable departure from the position articulated in Amendment 3. Amendment 3 explicitly states that the Area 3 LCMT plan was to take effect on January 1, 1999, and that absent such a plan the default measure of 2,000 traps would obtain. Defendant had already overerly delayed implementation of its regulations to manage federally controlled waters, and he was perfectly justified in implementing the default measures contemplated by Amendment 3. Furthermore, and as articulated above, the evidence is plentiful that Addendum 1 was not ready for wholesale implementation in December of 1999. As defendant states:

> On the one hand, had NMFS implemented trip limits based on the Area 3 LCMT Plan in the Final Rule without providing the public with notice and an opportunity to comment, the Agency would have violated the APA's rulemaking requirements. Likewise, without a fully developed biological, social and economic analysis of the impacts of the Area 3 LCMT Plan, NMFS would have violated its obligations under the Atlantic Coastal Act, the RFA, the National Environmental Policy Act ("NEPA"), and NMFS internal guidelines. On the other hand, had NMFS delayed the Final Rule in order to conduct this additional rulemaking and analysis, the Agency would have delayed federal American lobster conservation measures, thereby undermining its statutory obligation to curtail overfishing.

Defendant's Motion, P. 14. In order to achieve a balanced compromise, therefore, defendant elected to promulgate the default caps, while simultaneously beginning the rulemaking process required under the APA to evaluate Addendum 1. This was not an act in excess of defendant's statutory authority under the ACFCMA, as the uniform trap cap is consistent with Amendment 3's recommended default level.

d. *Does the Uniform Trap Cap Violate National Standards 1, 2, 4, 6, and 8 of the Magnuson–Stevens Act?*

■ The ACFCMA requires that any regulation issued pursuant to it be "consis-

tent with the national standards set forth in section 301 of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. § 1851)". 16 U.S.C. § 5103(b)(1)(B). Plaintiffs have alleged that the uniform trap cap violates national standards 1, 2, 4, 6, and 8. I address each in turn.

### i. *National standard 1*

National standard 1 provides as follows: (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

16 U.S.C. § 1851(a)(1). The "optimum yield" for a fishery does not mean the maximum yield for any given year; it means instead the maximum sustainable yield over a number of years for a stock. *See* 50 C.F.R. § 600.310(b); *Trawler Diane Marie, Inc. v. Brown,* 918 F.Supp. 921, 928 (E.D.N.C.1995), *aff'd,* 91 F.3d 134 (4th Cir.1996). Thus, "the relevant inquiry under National Standard One is not whether the challenged quota ensures to shark fishermen the highest possible catch during the current year but whether the quota is consistent with preventing overfishing while awaiting the onset of an optimum yield on a *continuing* basis." *Southern Offshore Fishing Association v. Daley,* 995 F.Supp. 1411, 1431 (M.D.Fla.1998) (emphasis in original). "Overfishing" in the lobster industry is defined at footnote 8 above.

Plaintiffs argue that

the regulations now in effect do not take any steps towards preventing overfishing. The most these regulations do is cap the existing effort without taking any steps to reduce it.... [T]here is a significant chance that the amount of fishing effort will be increased ... because there is no prohibition against ad-ditional vessels entering the offshore fishery and now fishing 1,800 traps. Further, there is no prohibition against vessels that were previously fishing less than 1,800 traps from now increasing the number of traps they are fishing up to 1,800.

Plaintiffs' Motion, P. 20. Defendant responds:

[Plaintiffs] assert that the flat trap limits, at most, cap existing effort, but do not prevent overfishing. As a threshold matter, just capping existing effort, in combination with other measures in the regulations, will help prevent overfishing and would satisfy National Standard 1. Indeed, flat trap limits were proposed by the [Atlantic] Commission itself in Amendment 3 as an effective measure to reduce overfishing.... [T]he relevant inquiry under National Standard 1 is not whether the challenged trap limit guarantees the highest possible reduction in overfishing, but whether it prevents overfishing while also achieving optimum yield. Therefore, NMFS has discretion to implement measures that help prevent or reduce overfishing, but are (sic) not required to stop overfishing immediately.... NMFS also considered the concerns raised by [plaintiffs] that the flat trap limit would cause an increase in fishing by allowing fishermen who fished below 1800 traps to expand their efforts and fish up to this limit, thereby increasing, not reducing, overfishing. This concern also implies that some fishermen would increase the number of their traps at the expense of fishermen who would be forced to reduce the numbers of their traps, thereby giving up their "territory."

In response to this concern, NMFS acknowledged that, while it was difficult to predict the behavior of fishermen, it was questionable whether new trap limits in

nearshore and offshore EEZ waters would attract vessels to Area 3, since Federal permit holders fishing only in nearshore waters have always had the option of fishing in offshore waters. Such a shift is also unlikely because those vessels that historically fished nearshore and that opt under the Final Rule to fish both nearshore and offshore would have to abide by the stricter nearshore trap limits, regardless of where the fishing for lobster occurs.

Defendant's Motion, PP. 20–21 (citations omitted). As already expressed, the "other measures" implemented by NMFS in conjunction with the uniform trap cap include an extended moratorium on new entrants to the fishery (which speaks to one of plaintiffs' concerns); designation of lobster management areas; lobster management area designation for vessels fishing for American lobster with traps; nearshore area trap limits; reduced nearshore maximum trap size; increased minimum escape vent size; Area 1 maximum carapace size; reduced offshore area maximum trap size; and a requirement to abide by the most restrictive measures if more than one area is fished in a year (though this regulation, too, is attacked in the present action). Defendant's Motion, P. 21; Record, 2323–2324.

In order to understand the textures of national standard one, I find three precedents of especial assistance. First, in *Trawler Diane Marie*, 918 F.Supp. 921, the court specifically considered the requirements of national standard 1 and affirmed the interim decision of the Secretary to close a scallop fishery. The court reasoned that the measure expedited the achievement of optimum yield for the fishery, in part because prevention of overfishing in the interim more nearly guarantees the long-term health of the fishery. Similarly, the court in *J.H. Miles & Co., Inc. v. Brown*, 910 F.Supp. 1138, 1148 (E.D.Va.

1995), found that the Secretary's 1995 commercial catch quotas for surf clams and ocean quahog conformed comfortably to national standard 1 because the Secretary acted to impress on the status quo a presumably wholesome arrangement, which the Secretary believed to benefit the long-term health of the fishery. So, too, in *Southern Offshore Fishing Association*, 995 F.Supp. 1411, where the court ruled that the Secretary's decision to reduce the quota of Atlantic sharks that could be caught per year did not violate national standard 1:

> [T]he Secretary's decision ... constitutes a cautious, risk-averse approach, designed to safeguard against further injurious declines in shark stocks and to ensure optimal yield and repopulation.... Considering the uncertainty in the data and the current stock assessment method, the Court defers to the Secretary's decision in "making difficult policy judgments and choosing appropriate management and conservation measures based on [his] evaluation[ ] of the relevant quantitative and qualitative factors." *National Fisheries Institute*, 732 F.Supp. at 223; *see also Fishermen's Dock Cooperative, Inc. of Point Pleasant Beach, N.J. v. Brown*, 75 F.3d 164, 172 (4th Cir.1996) ("[T]he choice of how much assurance [that the target fishing mortality will not be exceeded] to indulge in must be a policy choice left to the reasonable exercise of the discretion of the statutorily-authorized decisionmakers.").

*Southern Offshore Fishing Association*, 995 F.Supp. at 1431–1432.

There is evidence in the Record, uncontested by the parties, that the adoption of the 1,800 trap cap regulation will mean that *at least* 30% of the vessels that fish in the offshore Area 3 waters would be forced

to reduce the number of traps used in order to come into compliance with the uniform trap cap in the year 2000. There is evidence further that NMFS adequately considered and rejected more lenient alternatives (Alternative 1 above, a maintenance of the "status quo", wherein no trap limits applied, *see* Record, 1983) as well as more restrictive ones (Alternative 6, which called for an immediate ban on all lobster fishing, *see* Record, 1998) and determined that these and other alternatives either did not protect the lobster resource sufficiently or else were too onerous on the lobster fishing industry. Defendant also sufficiently addresses plaintiffs' criticisms about trap expansion for those fishermen who fish less than 1,800 traps in Area 3: defendant notes that nearshore fishermen who would expand their lobster traps into the offshore fishery would be limited by the regulation requiring them to abide by the stricter nearshore trap limits (800 traps, under 50 C.F.R. § 697.19(a)(2) and 697.4(a)(7)(v)). Furthermore, defendant points out that the Atlantic "Commission's Lobster Technical Committee stated that the Area 3 LCMT should reconsider closed areas for lobsters, due to the 'limited number of active fishermen ... and the large area encompassed by this management area.'" Defendant's Motion, P. 23 (citing Record, 5780). This speaks to plaintiffs' concerns that Area 3 fishermen would, in effect, be "giving up territory" because of the uniform trap cap: if the Atlantic Commission's Technical Committee is confident enough to recommend reconsideration of areas closed to lobster fishing because of the "limited number of active fishermen" in offshore Area 3, then one might infer that there is ample "fishing territory" in offshore Area 3 for any fishermen inclined to fish there for lobster.

Whatever the case, defendant has demonstrated that he made a reasonable determination that implementing the trap caps at 2,000 and 1,800 for 1999 and 2000 respectively would help to preserve the long-term health of the fishery, and would assist in achieving optimum yield in the lobster stock. This is not to say that the Area 3 LCMT plan or some other variant based upon historic participation should not now be studied and assessed by NMFS; but at the time he issued the uniform trap cap, defendant acted reasonably.

### ii *National standard 2*

16 U.S.C. § 1851(a)(2) provides the following:

> Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:
>
> . . . . .
>
> (2) Conservation and management measures shall be based upon the best scientific information available.

50 C.F.R. § 600.315(b)(1) illustrates various types of data that might constitute the "best scientific information available:"

> Scientific information includes, but is not limited to, information of a biological, ecological, economic, or social nature. Successful fishery management depends, in part, on the timely availability, quality, and quantity of scientific information, as well as on the thorough analysis of this information, and the extent to which the information is applied. If there are conflicting facts or opinions relevant to a particular point, a Council may choose among them, but should justify the choice.

Since the Secretary's decisions must be based merely upon the best scientific information available, "the [Magnuson–Stevens]

Act acknowledges that such information may not be exact or totally complete." *Parravano v. Babbitt,* 837 F.Supp. 1034, 1041 (N.D.Cal.1993) (citing *Washington Crab Producers, Inc. v. Mosbacher,* 924 F.2d 1438, 1448–49 (9th Cir.1990)). "[T]he Magnuson Act does not force the Secretary to sit idly by, powerless to conserve and manage a fishery resource, simply because they are somewhat uncertain about the accuracy of relevant information." *National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. 210, 220 (D.D.C.1990). However, though "the Magnuson Act permits the Secretary's designees to act on information that is incomplete or if there are differences in available information," it does not condone regulations promulgated entirely for the sake of compromise not braced by any scientific evidence. *J.H. Miles,* 910 F.Supp. at 1152; *see Southern Offshore Fishing Association,* 995 F.Supp. at 1433 ("Judicial review at this juncture is limited to determining whether the Secretary intelligently and knowingly decided on a rational policy, given the scientific and judgmental tools available to him."). It must be remembered that lack of dispositive evidence, and the absence of its use in the Secretary's ultimate decision "does not render an agency's determination 'arbitrary and capricious.'" *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir. 1992); *see Massachusetts v. Daley,* 170 F.3d at 30.

Plaintiffs allege the following with respect to the uniform trap cap and national standard 2:

[T]here is no scientific justification or information to support the use of this management measure to rebuild the lobster fishery. In September of 1997, the Northeast Fisheries Science Center did conduct an analysis of the effort reduction necessary for Amendment 3 of the ASMFC lobster plan. Based upon this analysis, it appears that the trap cap alone would not be sufficient to achieve the egg production needed to prevent over fishing. The author concludes that simple trap reduction will have limited impacts and that these impacts will be difficult to quantify. While this report was targeted towards the quantifiable measures contained in Amendment 3, the conclusions can be used to address the trap cap actually adopted by NMFS.... In the FEIS, NMFS ... makes no reference to any type of scientific review of the regulations being proposed. This clearly shows noncompliance with National Standard 2. The only proposed management measure for Area 3 which has been subjected to a scientific review is the Area 3 LCMT plan. This plan was found to meet the egg rebuilding requirements of Amendment 3 when the Lobster Technical Committee reviewed the effects of the proposed management measures. There was no similar review conducted for the NMFS plan.

Plaintiffs' Motion, PP. 22–23 (citations omitted). I do not find plaintiffs' arguments persuasive. First, the review conducted by the Northeast Science Center examined Amendment 3's trap cap measures, not those implemented by the Secretary (for example, the 1,800 trap cap for 2000). Second, defendant has never stated that it was implementing the flat trap cap in a vacuum, or "alone," as plaintiffs imply. As stated above, the uniform trap cap was implemented along with an assortment of other management options which, *in toto,* were expected to ameliorate the depleted lobster stock. Third, there is ample evidence to suggest that the defendant did, in fact, rely on the SAW 16 and SAW 22 lobster fishery assessments, as well as an independent peer review of those assessments (*see* Record, 25–31, 2051, 2201, 2326, DEIS, FEIS, and Regulatory Impact Re-

view), as evidence that the federal lobster fishery is in dire need of assistance, and that some sort of limitation on lobster fishing effort would help matters. Even the analysis cited by plaintiffs, found at Record, 975, indicates that "[c]learly, effort reductions or some type of cap on harvest will be required to achieve the overfishing definition."

It may be that the uniform trap cap, as enacted by the defendant, will require modification or reevaluation as more and better data is collected regarding the effectiveness of the present limits. For now, however, the court cannot say that the trap caps are not based on the best scientific information available, nor would it say that defendant acted arbitrarily, capriciously, or without regard to relevant scientific evidence in enacting the uniform trap cap.

### iii. *National standard 4*

Plaintiffs also assert that the regulation does not comply with national standard 4 of the Magnuson–Stevens Act, which provides, in relevant part:

> Conservation measures shall not discriminate between residents of different states. If it becomes necessary to allocate or assign fishing privileges among the various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). 50 C.F.R. § 600.325(c)(1) defines an allocation of fishing privileges as

> a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals.... [O]nly those measures that result in direct distribution of fishing privileges will be judged against the allocation requirements of Standard 4.... Allocations of fishing privileges include, for example, per-vessel catch limits, quotas by vessel class and gear type....

Again, the court takes the position that "unless the Secretary acts in an arbitrary and capricious manner in promulgating such regulations, they may not be declared invalid." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987). The parties appear not to dispute that the uniform trap cap allocates lobster fishing privileges per vessel. Plaintiffs do not allege violations of each segment of national standard 4; instead, they argue only two primary points: [19]

**19.** Though plaintiffs state that "the flat trap cap does not take any steps to promote conservation," they offer no support for this statement other than what "has been outlined above." Plaintiffs' Motion, P. 24. 50 C.F.R. § 600.325(c)(3)(ii) is instructive in that it illumines the broad latitude enjoyed by the Secretary in fashioning a regulation that complies with this aspect of national standard 4: Promotion of conservation. Numerous methods of allocating fishing privileges are considered "conservation and management" measures under section 303 of the Magnuson–Stevens Act. An allocation scheme may promote conservation by encouraging a rational, more easily managed use of the resource. Or, it may promote conservation (in the sense of wise use) by optimizing the yield in terms of size, value, market mix, price, or economic or social benefit of the product. To the extent that rebuilding plans or other conservation and management measures that reduce the overall harvest in a fishery are necessary, any harvest restrictions or recovery benefits must be allocated fairly and equitably among the commercial, recreational, and charter fishing sectors of the fishery.

In this case, according to the information contained in the FEIS, the initial reduction of traps in the offshore industry will affect only 20 trap vessels. The problem with this is the fact that 18 of these 20 are located in Rhode Island. This impact evidences the fact that the regulation adopted by NMFS discriminates between residents of different states.... The effect of the flat trap cap is not fair and equitable to all fishermen because there are certain fishermen who fish below the caps proposed that would not be impacted at all by the regulation. Clearly, this is not a fair and equitable distribution of fishing privileges.

Plaintiffs' Motion, P. 24.

In assessing whether or not the uniform trap cap discriminates against residents of different states, or is fair and equitable within the meaning of the Magnuson–Stevens Act, the court is guided by the following language at 50 C.F.R. § 600.325:

(b) Discrimination among residents of different states. An FMP may not differentiate among U.S. citizens, nationals, resident aliens, or corporations on the basis of their state of residence. An FMP may not incorporate or rely on a state statute or regulation that discriminates against residents of another state. Conservation and management measures that have different effects on persons in various geographic locations are permissible if they satisfy the other guidelines under Standard 4....

(c)(3)(i)(A) An allocation of fishing privileges should be rationally connected to the achievement of OY [Optimum Yield] or with the furtherance of a legitimate FMP objective. Inherent in an allocation is the advantaging of one group to the detriment of another. The motive

for making a particular allocation should be justified in terms of the objectives of the FMP; otherwise, the disadvantaged user groups or individuals would suffer without cause....

(c)(3)(i)(B) An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups. An allocation need not preserve the status quo in the fishery to qualify as "fair and equitable," if a restructuring of fishing privileges would maximize overall benefits. The Council should make an initial estimate of the relative benefits and hardships imposed by the allocation, and compare its consequences with those of alternative allocations schemes, including the status quo....

50 C.F.R. § 600.325(b) and (c)(3)(i)(A-B). The uniform trap cap does not differentiate among United States citizens, nationals, resident aliens, or corporations on the basis of their state of residence—it is, in fact, a uniform cap. Therefore, this regulation is permissible under this standard unless it violates some other provision. Plaintiffs have asserted that it is not fair and equitable.

Three cases, again, assist the court in determining whether the uniform trap cap is fair and equitable within the meaning of national standard 4. In *Alaska Factory Trawler*, 831 F.2d at 1456, an association of pot-fishing and trawling fishermen sought to invalidate an amendment to the Gulf of Alaska Groundfish Fishing Management plan. *Alaska Factory Trawler*, 831 F.2d at 1459. The disputed amendment, issued by the Secretary of Commerce, concerned the allocation of the sablefish optimum yield in

---

It is evident that a cap of any kind on lobster fishing would promote conservation under this definition.

the Gulf of Alaska among fishermen using various methods of fishing for groundfish: longline gear, pot gear, and trawl gear. *Id.* at 1461. The court determined that the sablefish was extensively fished and overfished by fishermen using trawling gear. *Id.* The longline fishermen presented various arguments to the North Pacific Fishery Management Council ("NPFMC") that counseled for a restraint on pot gear and trawl gear sablefish fishing. After extensive study and public meetings on the effects of a gear restraint on the sablefish stock (*see id.* at 1461–62, ¶¶ 7–8), the NPFMC, having considering a range of alternatives (*see id.* at ¶¶ 11–12), recommended that the Secretary pass the amendment. The plaintiffs then filed an action asking that this amendment be declared unlawful to the extent that it prohibited or restricted the harvest of sablefish by pot fishermen or trawlers in the Gulf of Alaska. *Id.* at 1463. In affirming the district court's grant of summary judgment to the defendant, the Ninth Circuit stated, with respect to the plaintiffs' national standard 4 claim:

> Plaintiffs claim that [the amendment] violates [national standard 4] because it discriminates in favor of longline fishermen, who are predominantly Alaskan, at the expense of trawlers and pot fishermen, who are predominantly non-Alaskan. . . . The administrative record constantly refers to the ground preemption and gear conflict problems which result from pot fishing and trawl fishing in the same area as longline fishing. In addition, the record indicates that all longliners will benefit from the regulation, not just Alaskan longliners. In light of this information, the Secretary could reasonably conclude that even though there may be some discriminatory impact from [the amendment], the regulations satisfy the requirements of National

Standard 4 in that they are tailored to solve the gear conflict problem and to promote the conservation of the sablefish.

*Id.*

Similarly, in *Sea Watch International v. Mosbacher,* 762 F.Supp. 370 (D.D.C.1991), plaintiffs sought judicial review of agency regulations that brought the surf clam and ocean quahog fisheries under a single management scheme built around individual transferable quotas ("ITQs"), which are transferable permits to fish for a fixed percentage of the annual aggregate. *Id.* at 373. With respect to national standard 4, plaintiffs there argued that this ITQ scheme was not fair and equitable because it treated similarly situated fishermen unequally, it rewarded violators of prior regulations, and it discriminated against owners of smaller fishing fleets. *Id.* at 376–77. In rejecting these claims, then District Judge Boudin stated:

> National Standard 4 does not require that allocations of quotas to fishermen be made by calculating the exact historical catch of each fisherman on an individual basis. . . . The record supports defendants' claim that vessel catch data . . . was the only accurate data available. . . . [Second,] it is not clear how adjustments could be made to eliminate the effect of previous violations, many of which . . . were never detected, and others of which have already been punished. Plaintiffs have failed to demonstrate that this use of past histories is irrational. . . . [Third,] it is quite possible that scale economies and transferability of ITQs will produce some consolidation. It is also possible that small fishermen enjoy advantages of their own, and nothing prevents coalitions of small owners from pooling their allocations to obtain efficiencies. . . . There is nothing invidious or inherently unfair in the plan adopted by the Council and the Secre-

tary. "Inherent in an allocation is the advantaging of one group to the detriment of another."

*Id.* at 377–78 (citing 50 C.F.R. § 602.14(c)(3)(i)).

Finally, in *Alliance Against IFQs v. Brown,* 84 F.3d 343 (9th Cir.1996), *cert. denied,* 520 U.S. 1185, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997), plaintiffs sued to overturn a regulation issued by the Secretary regulating sablefish and pacific halibut fishing, wherein any commercial fishing vessel fishing for these species was required to possess an individual fishing quota ("IFQ") permit on board, specifying the individual fishing quota allowed for the vessel. *Id.* at 345. Plaintiffs argued that the allocation of quota shares to vessel owners and lessees violated national standard 4's fair and equitable standard, because "[i]f all the quota shares go to vessel owners and lessees during that period, and none to the crew ... then this violates the statutory command of fairness and equity to 'all' fishermen." *Id.* at 349. The Ninth Circuit ruled against plaintiffs:

> [T]he Secretary's duty was not solely limited to allocating quota shares fairly and equitably among the fishermen. The plan also had to "prevent overfishing while achieving, on a continuing basis, the optimum yield," "be reasonably calculated to promote conservation," "promote efficiency," "minimize costs and avoid unnecessary duplication," and achieve several other criteria. There is a necessary tension, perhaps inconsistency, among these objectives. The tension, for example, between fairness among fishermen, preventing overfishing, promoting efficiency, and avoiding unnecessary duplication, necessarily requires that each goal be sacrificed to some extent to meeting the others.

*Id.* at 348–49.

These three cases indicate that plaintiffs carry a considerable burden to show that the uniform trap cap is not fair and equitable under national standard 4. They have not succeeded in shouldering it. Plaintiffs have not been singly identified and discriminated against by the uniform trap cap; nor does the fact that 18 of the 20 outfits that will be affected by the *initial* (and by this, the court assumes that plaintiffs imply the 2,000 trap cap for the year 1999) trap cap are located in Rhode Island indicate that the uniform trap cap is inherently unfair. Furthermore, even if the court were to assume that the uniform trap cap has the effect of unequally allocating the lobster fishing resource, the court accepts that the Secretary is entitled to allocate fishing privileges unequally if the end result will be a prevention of overfishing and a repletion of the stock. As stated earlier, defendant has shown that the uniform trap cap will contribute to lobster conservation and management.

### iv *National standard 6*

Next, plaintiffs claim that the uniform trap cap violates national standard 6 of the Magunson Stevens Act, which states:

> Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

16 U.S.C. § 1851(a)(6). Whatever standard 6 requires was best articulated in the *J.H. Miles* case:

> National Standard 6, on its face, dictates flexibility on the part of fishery managers. It suggests that the Secretary and his designees must be prepared to address uncertainties or changes that might arise. As the implementing regulations state, the "regime chosen must be flexible enough to allow timely re-

sponse to resource, industry and other national and regional needs."

*J.H. Miles*, 910 F.Supp. at 1155. Plaintiffs state that although the uniform trap cap differentiates between the nearshore and offshore fisheries within the EEZ, "it does not differentiate between the individuals that fish in the offshore fishery." Plaintiffs' Motion, P. 24. Since the disparity, prior to the uniform trap cap, among numbers of traps laid in the offshore EEZ ranges, according to plaintiffs, from as many as 5,000 traps to 600 or 800 traps per vessel, plaintiffs believe that national standard 6 requires further differentiation. *Id.*

■ This claim needs little discussion. There is no requirement in national standard 6 or anywhere else in the statute that defendant finely attune its regulations to each and every fishing vessel in the offshore fishery. Furthermore, as indicated by the defendant, NMFS included "adaptive management measures in the Final Rule that will enable future consideration of state/federal collaboration efforts, including trap reductions based on historical participation." Defendant's Motion, P. 30 (citing Record, 2202). This sort of flexibility is precisely what national standard 6

contemplates, and will be aided by the increasingly accurate data regarding individual catch histories in the offshore fishery (which did not exist at the time of the Final Rule's promulgation). Therefore, the uniform trap cap is not an arbitrary and capricious abuse of defendant's powers under national standard 6.

### v. *National standard 8*

The last national standard plaintiffs claim is implicated by the uniform trap cap is standard 8:

Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks) take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). Defendant points out that "Congress did not intend for this standard to be used as a basis for circumventing conservation requirements." Defendant's Motion, P. 31.[20] Plaintiffs only

---

**20.** In support of this assertion, defendant cites the comments of Senator Snowe, the sponsor of National standard 8:

During markup in the Commerce Committee, I offered an amendment which establishes a new national standard requiring all fishery management plans to minimize adverse economic impacts on fishing communities. The amendment was adopted by voice vote. This provision is retained in the bill on the floor today, although we have modified it to make clear that these economic considerations are not designed to trump conservation considerations in the process of developing fishery management plans.

Defendant's Motion, P. 31 (citing 142 Cong. Rec. S10825 (daily ed. September 18, 1996)); *see also* 50 C.F.R. § 600.345(b)(1) ("This stan-

dard requires that an FMP take into account the importance of fishery resources to fishing communities." This consideration, however, is within the context of the conservation requirements of the Magnuson–Stevens Act.) Deliberations regarding the importance of fishery resources to affected fishing communities, therefore, must not compromise the achievement of conservation requirements and goals of the FMP. Where the preferred alternative negatively affects the sustained participation of fishing communities, the FMP should discuss the rationale for selecting this alternative over another with a lesser impact on fishing communities. All other things being equal, where two alternatives achieve similar conservation goals, the alternative that provides the greater potential for sustained participation of such communities and minimizes

make scattered references to national standard 8, instead opting to subsume their analysis within an analysis of the regulations' non-compliance with the RFA. Plaintiffs' Motion, P. 25. However, neither the standards set in national standard 8 and the RFA, nor the requisite legal analysis for each, are the same. National standard 8 requires, as stated above, that NMFS minimize economic impacts of regulations on fishing communities "to the extent practicable," that is, to the extent feasible given the ultimate goals of fishery conservation and management.

As has been stated in this report, defendant considered, in the DEIS and the FEIS, various other alternatives before implementing the uniform trap cap, ranging from maintaining the status quo to enforcing a total ban on lobster fishing in federal waters. It also considered an alternative which would have been more restrictive than the option ultimately selected, a trap cap of 1,200 caps in the offshore EEZ, because it determined that this alternative would represent an overly onerous economic burden on lobster fishery participants. The 1,800 trap cap for 2000 was deemed a palatable compromise, not overly burdensome to fishermen and yet in keeping with NMFS' primary mission in this case: the repletion of the lobster stock. Plaintiffs seem to suggest that the flat trap cap is inadequate under a national standard 8 analysis because NMFS did not undertake an assessment of whether Rhode Island, as a state, would be unduly affected by the regulation. But national standard 8 requires only that NMFS "take into account the importance of fishery resources to *fishing communities*," not to states as a whole. 50 C.F.R. § 600.345(b)(3) defines "fishing communities:"

the adverse economic impacts on such com-

The term "fishing community" means a community that is substantially dependent on or substantially engaged in the harvest or processing of fishery resources to meet social and economic needs, and includes fishing vessel owners, operators, and crew, and fish processors that are based in such communities. A fishing community is a social or economic group whose members reside in a specific location and share a common dependency on commercial, recreational, or subsistence fishing or on directly related fisheries-dependent services and industries (for example, boatyards, ice suppliers, tackle shops).

*Id.* Given this definition, defendant identified port states impacted, and then further identified individual affected ports. The record, shows that major lobster ports include Point Judith and Newport in Rhode Island; Westport, New Bedford, Sandwich, Hyannis, and Gloucester in Massachusetts; and Newington in New Hampshire. [Record, 2012]. Furthermore, the bulk of Federally permitted lobster vessels are in Maine and Massachusetts ports, followed distantly by Rhode Island. [Record, 2009]. The record also reflects that many lobster fishermen have diversified into other fisheries and hold permits for the multispecies, squid/mackerel/butterfish, and Atlantic sea scallop fisheries. [Record, 2011]. Any economic impact from the flat trap limit can reasonably be expected to be reduced by this diversification.

Defendant's Motion, P. 34. And as for providing for the continued participation of these communities in the fishery and continued access to the fishery within the constraints of the condition of the resource, NMFS also fulfilled its obligations under national standard 8. Affected lobster

munities would be the preferred alternative.

fishermen may increase their trap-tending, thereby increasing efficiency, and there is no reason that plaintiffs and others affected may not continue to play a role in the development of a lobster plan based on historic participation. Therefore, the uniform trap cap complies with national standard 8.

### e. *Compliance with the RFA*

The Regulatory Flexibility Act of 1980 ("RFA") aims to prevent the inequitable impact of agency rules on small businesses, small organizations, and other small entities.[21] 5 U.S.C. §§ 601–612 (1994 & Supp. III 1997). The RFA accomplishes its goal by requiring agencies to analyze their rules and attempt to reduce the rules' impact on small businesses prior to their promulgation. *See* Jennifer McCoid, Comment, *EPA Rulemaking Under the Regulatory Flexibility Act: The Need for Reform,* 23 B.C. Envtl. Aff. L.Rev. 203, 208 (1995). The RFA requires agencies to prepare an Initial Regulatory Flexibility Analysis ("IRFA") of a proposed rule and publish it in the federal register. *See id.;* 5 U.S.C. § 605(b). After a comment period, a Final Regulatory Flexibility Analysis ("FRFA") accompanies the publication of a final rule, and agencies are exempt from this process only if they certify that the proposed rule does not significantly impact a "substantial number" of small entities. *See* 5 U.S.C. §§ 604, 605(b). Although the APA already permits public comment on proposed agency rules, the RFA places new responsibilities on agencies to develop accurate and thorough RFA analyses. If an agency determines that a significant impact on small entities exists, it must explore alternatives to the regulatory proposals that would mitigate the potential economic and regulatory effect. 5 U.S.C. § 603(c). "The RFA does not command an agency to take specific substantive measures, but rather, only to give explicit consideration to less onerous options." *A.M.L. International,* 107 F.Supp.2d at 105; *Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 114 (1st Cir.1997). An FRFA must contain:

> a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statutes, including a statement of the factual, policy and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a)(5). Hence, "... Congress, in enacting section 604, intended to compel administrative agencies to explain the bases for their actions and to ensure that alternative proposals receive serious consideration at the agency level." *Associated Fisheries of Maine,* 127 F.3d at 114.

In its original enactment, the RFA precluded judicial review of an agency's failure to comply with its requirements, but in 1996 Congress amended the RFA by passing the Small Business Regulatory Enforcement Fairness Act ("SBREFA") which provides for judicial review of the mandatory regulatory flexibility analysis. Small Business Regulatory Enforcement Fairness Act of 1996, Pub.L. No. 104–121, §§ 241–42, 603(a), 611, 110 Stat. 857, 864–66 (codified as amended at 5 U.S.C. §§ 603(a), 611 (Supp. III 1997)).

Plaintiffs concede that defendant prepared both an IRFA in the DEIS and an FRFA in the FEIS, and the parties are in

---

**21.** A "small entity" as defined by the RFA encompasses a variety of small organizations, including small businesses, nonprofit enter-prises, and small governmental jurisdictions. *See* 5 U.S.C. § 601(6).

agreement that the challenged regulations will significantly impact a "substantial number" of small entities within the meaning of 5 U.S.C. § 605(b). The principal challenge the plaintiffs mount stems from the recurring argument that:

> During the public comment period [between DEIS and FEIS], numerous commentators submitted information to NMFS about an alternative plan for the offshore fishery. Specifically, the plan approved by the LCMT for Area 3 and reviewed by the Lobster Technical Committee of the ASFMC in October of 1998 was submitted for consideration as an alternative.... While not identical to what was described as nonselected alternative 5, which required nearshore fixed trap limits and offshore historical participation, it was somewhat similar in that it did require an individual fishing in the offshore fishery to establish historic participation in order to continue to fish in that area. NMFS rejected consideration of the LCMT plan as an alternative and rejected alternative 5 [its own historic participation alternative].... In the FEIS [defendant] states in part as follows:

>> "The number of lobster traps under [Alternative 5] will likely increase in the offshore EEZ waters as compared to alternative 3. Accordingly, it would likely contribute to higher lobster mortality levels, thereby prolonging the achievement of lobster management goals throughout the range of the resource.... This alternative would alleviate the social and economic impacts of a trap reduction schedule for the off-shore EEZ fishery.... However, as under alternative 4, it is difficult to predict how well this approach would succeed in the absence of an accurate and industry-accepted way to certify previous levels of fishing effort on a vessel by vessel basis."

Plaintiffs' Motion, P. 29. Plaintiffs go on to criticize the logic and scientific prognostications of the defendant, arguing that the historic participation option would reduce fishing mortality, that defendant's selection of Alternative 2 for the year 1999, followed by a reduction by 200 traps for the year 2000 did not receive adequate analysis under the RFA, that NMFS admitted that the historic participation alternative would mitigate negative economic effects on the offshore fishing fleet (especially the 18 Rhode Island vessels possessed by some plaintiffs), and that defendant's concern about verification of prior fishing levels is unfounded. *Id.* at 29–30.

■ Under the standard enunciated for judicial review of compliance with the RFA, the court reviews only whether the agency conducted a complete IRFA and FRFA, in which it described steps to minimize the economic impact of its regulations on small entities and discussed alternatives, providing a reasonable explanation for their rejection. *See* 5 U.S.C. §§ 603(b)-(c); 604(a)(5); *A.M.L. International,* 107 F.Supp.2d at 105. The court is not asked to make up its own mind about which option seems to it the most efficacious. Here, the record is clear that defendant complied with the RFA requirements, including both an IRFA in the DEIS and an FRFA in the FEIS, as well as the public comments received from the DEIS and included in the FEIS. Record, 2013–2022. Defendant also examined its own historic participation alternative (as already explained, defendant did not deem the Area 3 LCMT plan ready for implementation, and the court is not inclined to brand this judgment unreasonable) and decided that while this option was perhaps less onerous on the lobster fishermen, it would not achieve the lobster conservation goals defendant thought necessary. Sufficient analysis and explanations for the rejection

of other alternatives may be found at Record, 1963–2001; 2325–2327; 2339. NMFS also refuted plaintiffs' concerns that a flat trap cap might lead to an increase in the number of traps fished, stating that it was questionable whether new nearshore and offshore trap limits would attract more vessels, given the additional requirement that vessels fishing in both zones abide by the most restrictive trap cap applicable to either zone. As defendant points out, "[t]his response is a reasonable explanation of why NMFS determined that the flat trap limit would be unlikely to lead to increased fishing effort...." This court agrees. Whether or not defendant's predictions turn out accurately, defendant has offered a reasonable rebuttal to plaintiffs' criticisms. This is all that is required. The RFA permits defendant to select an alternative that is more economically burdensome if there is evidence that other alternatives "would not have accomplished the stated objectives of the applicable statutes." *Associated Fisheries of Maine,* 127 F.3d at 114 (citing 126 Cong. Rec. at S21, 459–60). This is precisely what NMFS elected to do in this instance, judging that its own historic participation alternative would not aid sufficiently in the ultimate aim of lobster repletion and management, and selecting the uniform trap cap instead.

As articulated by the First Circuit, "[t]he point is not whether the Secretary's judgments are beyond reproach, but whether he made a reasonable, good-faith effort to canvass major options and weigh their probable effects." *Id.* at 116. In this case, the record reflects that "the Secretary explicitly considered numerous alternatives, exhibited a fair degree of sensitivity concerning the need to alleviate the regulatory burden on small entities within the fishing industry, adopted some salutary measures designed to ease that burden, and satisfactorily explained his reasons for rejecting others." *Id.*

### f. *Defendant's Authority to Implement the Regulations under the ACFCMA*

Plaintiffs' next claim proceeds as follows:

It is plaintiffs' position that the intent of [the ACFCMA, pursuant to 16 U.S.C. § 5103(b) ] is to authorize the Secretary to implement regulations to govern fishing in the EEZ when there is no FMP duly adopted and approved by the appropriate Council. The authority under this section is interim and intended to fill the gap during the time period that the appropriate Council is reviewing and adopting an FMP under the Magnuson–Stevens Act. This section is not inteded to supersede or otherwise be used in lieu of the Magnuson–Stevens Act and the [Sustainable Fisheries Act].... In this case the Secretary has attempted to tip the process on its head by purportedly adopting regulations under the ACFCMA, while at the same time withdrawing approval of an existing and implemented Fishery Management Plan for American Lobster that had been put into effect under the provisions of the Magnuson–Stevens Act. At the time the Secretary first put out notice of the possibility of adopting these new regulations under the ACFCMA, there was in existence an approved and implemented FMP for the American Lobster Fishery. Therefore, the initial preparation of these draft regulations and the supporting documents was in excess of the authority granted to the Secretary under 16 U.S.C. § 5103.

Plaintiffs' Motion, PP. 38–39. Plaintiffs cite to no case supporting this interpretation of the interplay among the ACFCMA and the Magnuson–Stevens Act with respect to regulation of the American lobster.

As stated earlier, when the court deals with a question of an agency's interpreta-

tion of its empowering statute, the court first examines whether Congress has spoken directly to the issue in question, or whether the intent of Congress is clearly and unambiguously expressed. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. The court's review always begins with the text of the statute itself, and the court may go beyond the plain meaning of the statutory terms only if there is a clearly expressed legislative intent to the contrary, in the rare case where literal application of the statute produces a result demonstrably at odds with the intention of the drafters or where it would produce an absurd result. *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); *Russello v. United States,* 464 U.S. 16, 20, 104 S.Ct. 296, 298–99, 78 L.Ed.2d 17 (1983); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). Only if the statute is silent or ambiguous on the particular issue will the court defer to an agency interpretation that is reasonable. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

The text of the ACFCMA explicitly anticipates that if a particular FMP under the Magnuson–Stevens Act is already in place at the time the Secretary issues regulations pursuant to the ACFCMA affecting the same fishery, then the Magnuson–Stevens FMP trumps any regulations under the ACFCMA. *See* 16 U.S.C. § 5103(b)(1)(B). Furthermore, 16 U.S.C. § 1854(h) provides the following with respect to withdrawal of FMPs under the Magnuson–Stevens Act:

**(h) Repeal or revocation of a fishery management plan**

The Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council.

*Id.* However, Congress was unambiguous in adding the following historical note in 1996: "Section 304(h) of the Magnuson–Stevens Fishery Conservation and Management Act, as amended by this Act [subsection (h) of this section] shall not apply to the American Lobster Fishery Management Plan." Section 109(j) of Pub.L. 104–297, as amended Pub.L. 104–208, Div. A, Title I, § 101(a), September 30, 1996, 110 Stat. 3009–41. Defendant argues that this exemption of the lobster FMP from the usual method of withdrawal evinces a recognition by Congress that the NEFMC already approved of withdrawal of the lobster FMP; Congress, therefore, did not want "to impede that withdrawal by requiring additional consultation with the Council, or requiring additional action by the [NEFMC] itself." Defendant's Motion, P. 48. This explanation is buttressed by a provision in the ACFCMA, which demonstrates that Congress plainly expected a transition in lobster conservation and management from the Magnuson–Stevens Act to the ACFCMA:

**§ 5107b. Transition to management of American Lobster Fishery by Commission**

**(a) Temporary Limits**

Notwithstanding any other provision of this chapter or of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), if no regulations have been issued under § 5103(b) of this title by December 31, 1997, to implement a coastal fishery management plan for American lobster, then the Secretary shall issue interim regulations before March 1, 1998, that will prohibit any vessel that takes lobsters in the exclusive economic zone by a method other than pots or traps from landing lobsters (or any parts thereof) at

any location within the United States in excess of—

(1) 100 lobsters (or parts thereof) for each fishing trip of 24 hours or less duration (up to a maximum of 500 lobsters), or

(2) 500 lobsters (or parts thereof) for a fishing trip of 5 days or longer.

16 U.S.C. § 5107b(a). Congress clearly anticipated, therefore, that the ACFCMA, not the Magnuson–Stevens Act, was to be the mechanism by which the lobster resource would be conserved and managed. Further reinforcing this conclusion are the defendant's citations to the legislative history of the Magnuson–Stevens Act. First, the comments of Representative Gerry Studds in 1995:

Recently [NMFS] has indicated that the [federal lobster plan] may be withdrawn. If it is, the prohibition on the sale and shipment of undersize lobsters would no longer be in effect and our market would be flooded with undersized lobsters. This would have serious implications for the resource and the industry. This amendment would ensure that the prohibition would remain in effect by allowing the minimum size established by the [Atlantic Commission] to serve as the baseline in the absence of a Federal plan.

Defendant's Motion, P. 49 (citing 141 Cong. Rec. H10213 (October 18, 1995) (statement of Rep. Studds)). Second, the comments of Senator Olympia Snowe, supporting similar language in the Senate bill because it "insures that the ban will remain in place even after the [Atlantic Commission] assumes responsibility for lobster management in the Federal zone." Defendant's Motion, P. 50 (citing 142 Cong. Rec. S10794–02, S10825) (September 18, 1997) (statement of Sen. Snowe).

It seems quite clear, therefore, that Congress intended that lobster management and conservation should proceed under the ACFCMA after 1996. Furthermore, there is no indication from the legislative history or any other source that would support plaintiffs' claim that posting notice or even issuing a Proposed Rule for lobster regulation under the ACFCMA is in contravention of the supremacy of the Magnuson–Stevens Act. It is only when the rule becomes final that any incompatibility between ACFCMA regulations and an existing Magnuson–Stevens FMP is resolved in favor of the latter. Finally, plaintiffs' claim that the Secretary's powers under the ACFCMA are "interim" or "gap filling" pending the full review of the Councils under the Magnuson–Stevens Act is utterly without merit or support. Defendant did not exceed his statutory authority by implementing these regulations pursuant to the ACFCMA.

g. *§ 697.4(a)(7)(v)—Abiding by the most restrictive management measures in effect for any one of the specified areas*

██ The final challenge brought by plaintiffs, and perhaps the weakest, is their claim that 50 C.F.R. § 697.4(a)(7)(v) is an abuse of discretion and in violation of statutory authority. Though this characterization would seem to implicate both a *de novo* and an arbitrary and capricious standard of judicial review, the text of the attack, such as it is, focuses exclusively on the arbitrary and capricious quality of this regulation. The claim thus proceeds:

While the record has very little, if any, commentary on the above issue, the arguments raised by plaintiffs relative to the failure to consider historic participation and the failure to do an appropriate economic analysis are equally applicable to this regulatory section. It should be obvious that the impact of this

regulation on an entity such as Ace Lobster is significant if not devastating.

Plaintiffs' Motion, P. 41.

Unfortunately for plaintiffs, it is not obvious. Plaintiffs have failed to articulate exactly how they are adversely affected by this regulation, how this regulation represents an unreasonable and arbitrary choice on the defendant's part, or what alternatives under their historic participation plan would replace this regulation and better serve them and the fishery as a whole. Instead, they have left the court to do their work. As the First Circuit has warned:

> It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly' or forever hold its peace.'"

*United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990) (citing *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988) (citing *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.,* 840 F.2d 985, 990 (1st Cir.1988))). Consequently, and for this reason alone, I would recommend that summary judgment enter for defendant on this claim.

Additionally, however, I note that this regulation did receive adequate attention in the Comment and Response section of the Final Rule, Record, 2330,[22] as well as in the FEIS, Record, 1969. Furthermore, NMFS rejected a more restrictive alternative, which would have prohibited vessels from lobster fishing in the offshore area if any nearshore area was elected and *vice versa* (the "mutual exclusion" option). Defendant felt that this restriction was too onerous a limitation on the industry, and would not be compatible with the Atlantic Commission's ISFMP. Record, 2326. The "most restrictive" alternative represented a compromise position.

I find that plaintiffs have not clearly and thoroughly articulated the precise basis for their attack on this regulation.

*Conclusion*

For the reasons discussed, I recommend that the district court grant defendant's motion for summary judgment and deny plaintiffs' motion for summary judgment. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. *See* Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

May 4, 2001.

---

**22.** Comment and Response 52 state as follows:

> Comment 52: One commenter stated that lobstermen fishing exclusively in state waters should not be limited to Federal trap limits, even if they hold a Federal lobster permit.
>
> Response: NMFS disagrees. Federal lobster permit holders must abide by stricter Federal regulations, when such regulations exist, even when fishing in state waters. This promotes enforceability and consistency between state and federal jurisdictions. A vessel fishing exclusively in state waters has the option of turning in the Federal permit.
>
> Record, 2330.